IRIZARRY, CH.J.

GOLD, M.J.

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ FEB 27 2019 ★

BROOKLYN OFFICE

JMK:AES/JN
F. #2019R00102

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

- against –

JOSE CARLOS GRUBISICH,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

I N D I C T M E N T

CR 19 102

Cr. No. _____
(T. 15, U.S.C., §§ 78dd-1, 78ff(a) and
78ff(c)(2)(a); T. 18, U.S.C., §§ 2, 371,
981(a)(1)(C), 982(a)(1), 982(b)(1), 1956(h)
and 3551 et seq.; T. 21, U.S.C., § 853(p); T.
28, U.S.C., § 2461(c))

THE GRAND JURY CHARGES:

At all times relevant to this Indictment, unless otherwise indicated:

I.    The Defendant

1.    The defendant JOSE CARLOS GRUBISICH was a Brazilian citizen and

served as the Chief Executive Officer ("CEO") of Braskem, S.A. ("Braskem"), a Brazil-based

petrochemical company, from in or about and between 2002 and 2008.  GRUBISICH served as a

member of Braskem's Board of Directors ("BOD") from in or about and between 2010 and

2012.  GRUBISICH also worked in various capacities for Odebrecht S.A. ("Odebrecht"), a

Brazil-based holding company with a controlling stake in Braskem.  Specifically, GRUBISICH

served as the CEO of ETH Bioenergia S.A. ("ETH"), Odebrecht's ethanol business, from in or

about and between 2008 and 2012, and as a consultant for Odebrecht from in or about and

between 2012 and 2015.  Braskem was an "issuer" within the meaning of the Foreign Corrupt

Practices Act ("FCPA"), Title 15, United States Code, Section 78dd-1(a).  Thus, GRUBISICH

1

was an "officer," "director," "employee," "stockholder" and "agent" of an issuer within the
meaning of the FCPA, Title 15, United States Code, Section 78dd-1(a).

II.     Relevant Entities and Individuals

2.      Braskem was a *sociedade anônima* (corporation) organized under the laws
of Brazil and headquartered in São Paulo, Brazil.  Braskem was one of the largest petrochemical
companies in the Americas, producing a portfolio of petrochemical and thermoplastic products.
American depositary shares of Braskem traded on the New York Stock Exchange, and Braskem
was required to file annual reports with the United States Securities and Exchange Commission
(the "SEC") under Section 15(d) of the Securities Exchange Act of 1934 (the "Exchange Act"),
Title 15, United States Code, Section 78o(d).

3.      Braskem Incorporated Limited ("Braskem Incorporated") was a wholly-
owned subsidiary of Braskem.  It was incorporated with limited liability under the laws of the
Cayman Islands and headquartered in Grand Cayman.  Braskem Incorporated was an "agent" of
an issuer, Braskem, within the meaning of the FCPA, Title 15, United States Code, Section
78dd-1(a).

4.      Odebrecht was a Brazilian holding company that, through various
operating entities, subsidiaries and companies in which it was a majority shareholder, conducted
business in multiple industries, including engineering, construction, infrastructure, energy,
chemicals, utilities and real estate.  Odebrecht had its headquarters in Salvador, state of Bahia,
Brazil, and operated in at least 27 other countries, including the United States.  Odebrecht
indirectly owned 38.1 percent of the total shares of Braskem, and controlled Braskem through its
ownership of 50.11 percent of the voting shares.

2

5.      Petróleo Brasileiro S.A. - Petrobras ("Petrobras") was a Brazilian state-owned and state-controlled oil company headquartered in Rio de Janeiro, Brazil. The Brazilian government directly owned more than 50 percent of Petrobras's common shares with voting rights, while an additional 10 percent of Petrobras's shares were controlled by the Brazilian Development Bank and Brazil's Sovereign Wealth Fund. Petrobras was therefore controlled by the Brazilian government and performed government functions, and thus was an "agency" and "instrumentality" of a foreign government, as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-1(f)(1). Petrobras also owned 36.1 percent of the shares of Braskem.

6.      Co-Conspirator 1, a Brazilian citizen whose identity is known to the Grand Jury, was a director of Braskem and a senior executive of Odebrecht from in or about and between 2002 and 2008, and a director of Odebrecht from in or about and between 2009 and 2016.

7.      Co-Conspirator 2, a Brazilian citizen whose identity is known to the Grand Jury, was an executive of Braskem from in or about and between 2002 and 2007, and an executive of Odebrecht and one of its subsidiaries from in or about and between 2007 and 2015.

8.      Co-Conspirator 3, a Brazilian citizen whose identity is known to the Grand Jury, was a director of Braskem from in or about and between 2009 and 2015, and an officer and senior executive of Odebrecht from in or about and between 2002 and 2015.

9.      Co-Conspirator 4, a Brazilian citizen whose identity is known to the Grand Jury, was a senior executive of Braskem from in or about and between 2002 and 2006, and a senior executive of Odebrecht and one of its subsidiaries from in or about and between 2006 and 2016.

3

10.    Co-Conspirator 5, a Brazilian citizen whose identity is known to the Grand Jury, was a senior executive of Braskem from in or about and between 2006 and 2016, and a consultant for Odebrecht from in or about and between 2016 and 2019.

11.    Co-Conspirator 6, a Brazilian citizen whose identity is known to the Grand Jury, was a senior executive in Odebrecht's Division of Structured Operations ("DSO") from in or about and between 2006 and 2015.

12.    Co-Conspirator 7, a Brazilian citizen whose identity is known to the Grand Jury, was a consultant for Braskem from in or about and between 2006 and 2015.

13.    Co-Conspirator 8, a Brazilian citizen whose identity is known to the Grand Jury, was a senior executive of Braskem from in or about and between 2008 and 2010.

14.    Foreign Official 1, an individual whose identity is known to the Grand Jury, was an executive and director at Petrobras from in or about and between 1977 and 2012. Foreign Official 1 was a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(f)(1).

15.    Foreign Official 2, an individual whose identity is known to the Grand Jury, was an official in the legislative branch of the government of Brazil from in or about and between at least 2005 and 2010. Foreign Official 2 was a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(f)(1).

16.    Intermediary 1, a Swiss citizen whose identity is known to the Grand Jury, served as an intermediary between Braskem and Foreign Official 1 from in or about and between at least 2008 and 2010.

4

III.     The Criminal Scheme

    A.     Overview

      17.     Between approximately 2002 and 2014, Braskem, together with

Odebrecht, certain Braskem and Odebrecht employees and agents and other co-conspirators,

engaged in a massive bribery scheme that resulted in the diversion of approximately $250

million of Braskem's funds into a secret slush fund, and the subsequent use of that slush fund to

pay bribes to government officials, political parties and others in Brazil to obtain and retain

business.

      18.     To effectuate the scheme, Odebrecht created and funded an elaborate,

secret financial structure that operated to account for and disburse bribe payments to, and for the

benefit of, foreign officials and foreign political parties.  By in or about 2006, the development

and operation of this secret financial structure had evolved such that the DSO was formally

established.  The DSO effectively functioned as a stand-alone bribe department within Odebrecht

for the benefit of Odebrecht and its subsidiaries, including Braskem.  The DSO received funds

generated by various Odebrecht-related entities that were not recorded in the entities' financial

statements (including, as detailed below, from a Braskem slush fund), and then funneled those

funds to the ultimate bribe recipients.  To conceal the origin of the funds, and distance them from

the final beneficiaries, transactions executed by the DSO were layered through multiple levels of

offshore entities and bank accounts throughout the world.  The DSO also utilized an entirely

separate and off-book communications system, often referred to as "Drousys," which allowed

DSO employees, certain employees of Odebrecht and Braskem and other co-conspirators to

5

communicate about the corrupt payments through the use of secure emails and instant messages, using codenames and passwords.

19.     Prior to in or about 2006, Odebrecht made corrupt payments to support the financial and political interests of Braskem. In or about 2006, Odebrecht required Braskem to contribute funds from Braskem's own operations towards those corrupt payments. To generate such funds, Braskem created an off-books slush fund known as a *caixa dois* ("Caixa 2"), and transferred money into Caixa 2 by making payments pursuant to fraudulent "commissions" contracts with offshore shell companies controlled by Braskem. Funds for Caixa 2 were funneled from Braskem's bank accounts in Brazil, New York and Florida to those offshore shell companies, and then to accounts held by the DSO. Those funds were subsequently disbursed by the DSO to make corrupt payments on Braskem's behalf. In total, between in or about 2006 and 2014, Braskem diverted approximately 513 million Brazilian reais[1] (equivalent to approximately $250 million) into offshore shell companies for transfer into accounts managed by the DSO.

20.     As part of the above-described scheme, in or about and between 2002 and 2014, the defendant JOSE CARLOS GRUBISICH, together with others, agreed to make millions of dollars in corrupt payments to, and for the benefit of, government officials, political parties and others in Brazil to secure an improper advantage and to obtain and retain business for Braskem and Odebrecht. Specifically, during this period, GRUBISICH and his co-conspirators agreed to create the Caixa 2 slush fund, the proceeds of which were used by the DSO to make corrupt payments on Braskem's behalf to Brazilian government officials and political parties.

---

[1] The Brazilian real is the official currency of Brazil; its plural form is "reais," and its symbol is "R$." All conversions from reais to American dollars contained herein are approximate and based on historical exchange rates.

6

GRUBISICH approved bribe negotiations and bribe payments that were later made by the DSO to Foreign Official 1, among others, including payments made to ensure that Braskem could retain a contract for a significant petrochemical project in Brazil, and to ensure that Braskem could obtain favorable pricing in contract negotiations with Petrobras.

21.     Furthermore, while CEO of Braskem, the defendant JOSE CARLOS GRUBISICH agreed with others to falsify Braskem's books and records by falsely recording payments to offshore shell companies controlled by Braskem as "commissions." Despite his direct participation in the above-described bribery scheme, GRUBISICH signed false certifications submitted to the SEC, which among other things, attested that Braskem's annual reports fairly and accurately represented Braskem's financial condition, and that GRUBISICH, as Braskem's principal officer, had disclosed all fraudulent conduct by Braskem's management and other employees with control over Braskem's financial reporting.

B.     The Defendant JOSE CARLOS GRUBISICH's Involvement in
the Creation of Caixa 2

22.     As detailed above, Odebrecht began making corrupt payments to obtain and retain business on behalf of Odebrecht and Braskem in or about and between 2001 and 2002. The defendant JOSE CARLOS GRUBISICH became CEO of Braskem in 2002. In that capacity, between in or about 2002 and 2006, GRUBISICH agreed with others that Odebrecht would make corrupt payments to support Braskem's financial and political interests.

23.     In or about 2006, Co-Conspirator 3, then a senior executive at Odebrecht, met with the defendant JOSE CARLOS GRUBISICH and Co-Conspirator 1. Co-Conspirator 3 advised GRUBISICH and Co-Conspirator 1 that, going forward, Odebrecht would no longer make corrupt payments to government officials for the benefit of Braskem unless Braskem

7

contributed funds towards such payments, and that Braskem was expected to generate and provide such funds to the DSO.

24.     The defendant JOSE CARLOS GRUBISICH and Co-Conspirator 1, together with others, had discussions and agreed that Braskem would set up Caixa 2, a Braskem-specific slush fund that would funnel funds to the DSO so that Odebrecht would continue to make corrupt payments to government officials on behalf of and to benefit Braskem.  In or about 2006, GRUBISICH and Co-Conspirator 1 instructed Co-Conspirator 4, then an executive in Braskem's finance department, to create a system for Braskem to generate funds for Caixa 2. Co-Conspirator 4 hired Co-Conspirator 7, a consultant paid by Braskem, to help with this task.

25.     Co-Conspirator 7 set up three corporate entities registered in the United Kingdom (the "Caixa 2 Entities"), which purported to be import and export agents that were independent of, and provided services to, Braskem.  In fact, however, the Caixa 2 Entities were shell companies controlled by Braskem that did not provide any legitimate services to Braskem. The co-conspirators, including the defendant JOSE CARLOS GRUBISICH, used the Caixa 2 Entities to generate funds for the DSO that were not properly recorded by: (1) creating fraudulent contracts between Braskem and the Caixa 2 Entities; (2) causing Braskem to make payments on those fraudulent contracts to bank accounts in the names of the Caixa 2 Entities; and (3) transferring funds from the Caixa 2 Entities to offshore bank accounts controlled by the DSO. The payments to the Caixa 2 Entities were made using, among other accounts, Braskem's bank accounts in Brazil as well as a New York-based bank account and a Florida-based bank account held by Braskem Incorporated.

8

C.     The Defendant JOSE CARLOS GRUBISICH's Direction of Bribe Payments Made from the DSO for the Benefit of Braskem

26.     During his tenure as CEO of Braskem, and in that capacity, the defendant JOSE CARLOS GRUBISICH authorized and approved Braskem's payments to the Caixa 2 Entities for transfer to the DSO, and negotiated and authorized bribe payments that were disbursed from the DSO on Braskem's behalf. Co-Conspirator 1, Co-Conspirator 2 and GRUBISICH regularly discussed the bribe payments, and Co-Conspirator 1 kept GRUBISICH informed about bribe payments made by Odebrecht on behalf of Braskem. Certain of the bribe payments that were negotiated and authorized by GRUBISICH were ultimately paid by the DSO after GRUBISICH left his position as CEO, but while he continued to serve in other capacities at Odebrecht and Braskem, and while he was a stockholder of Braskem.

1.     The Defendant JOSE CARLOS GRUBISICH Approved a $4.3 Million Bribe to Foreign Official 1 to Retain Contracts With Petrobras

27.     In or about 2005, Braskem signed a series of contracts with Petrobras for a petrochemical project. Specifically, Braskem agreed to complete the construction of a polypropylene (plastics) plant in Brazil. In his role as an executive and director at Petrobras, Foreign Official 1 had control over the construction of the plant. Subsequently, Braskem executives, including the defendant JOSE CARLOS GRUBISICH, became concerned that Petrobras would reassign those contracts to one of Braskem's competitors.

28.     In or about 2006, the defendant JOSE CARLOS GRUBISICH directed Co-Conspirator 2 to negotiate a bribe of up to $4.3 million to Foreign Official 1 and others in exchange for Foreign Official 1's help in retaining the Petrobras contracts for Braskem. Co-Conspirator 2 then negotiated bribe payments to Foreign Official 1, Foreign Official 2, their

9

affiliated political party and others totaling $4.3 million in exchange for Braskem retaining the contracts. It was further agreed that no bribe payments would be made until certain aspects of the plant's construction were actually underway. Co-Conspirator 2 then brought the terms of the bribe proposal to GRUBISICH for approval, and GRUBISICH agreed to those terms.

29.     In or about and between 2007 and 2008, after Petrobras retained its contracts with Braskem and construction on the plant proceeded, the DSO made the agreed-upon $4.3 million bribe payments in multiple installments to Foreign Official 1, Foreign Official 2, their political party and others.

> 2.     The Defendant JOSE CARLOS GRUBISICH Authorized Bribe Negotiations with Foreign Official 1 to Secure a Petrobras Contract for Braskem

30.     In or about 2008, Braskem and Petrobras began to negotiate a new long-term contract for naphtha, a raw material used by Braskem in its petrochemical operations. Petrobras initially proposed a pricing formula that would have required Braskem to pay a higher price for naphtha to Petrobras. Braskem rejected this proposal and instead proposed a formula that resulted in Braskem paying a lower price.

31.     Prior to leaving his position as CEO of Braskem, the defendant JOSE CARLOS GRUBISICH, along with others, initiated negotiations with Foreign Official 1 and others to obtain the favorable naphtha pricing Braskem sought in its contract with Petrobras. As part of the negotiations, GRUBISICH met with Foreign Official 1, and directed Co-Conspirator 2 to initiate bribe negotiations on behalf of Braskem with Foreign Official 2. Before leaving his position as CEO of Braskem, GRUBISICH asked Co-Conspirator 5, a senior executive at Braskem, to introduce Intermediary 1 to Co-Conspirator 6, a senior DSO executive.

GRUBISICH requested that Co-Conspirator 5 make the introduction, noting that Intermediary 1 had a pre-existing relationship with Foreign Official 1. Ultimately, Intermediary 1 served as a conduit for Braskem's bribe payments to Foreign Official 1 by, among other things, coordinating the transfer of money from offshore bank accounts controlled by the DSO to bank accounts controlled by, or for the benefit of, Foreign Official #1.

32.     In or about and between 2009 and 2011, after the defendant JOSE CARLOS GRUBISICH had left his position as CEO of Braskem and after additional negotiations, Foreign Official 1 and Foreign Official 2 helped Braskem receive favorable pricing on the naphtha contract. In exchange, Foreign Official 1, Foreign Official 2 and others received approximately $12 million in bribe payments from Braskem. The bribe payments to Foreign Official 1 and Foreign Official 2 were made through the DSO, and some were made with Intermediary 1's assistance. For example, on or about August 26, 2011, members of the conspiracy caused $1 million to be transferred to a bank account held in the name of Sygnus Assets S.A. for the benefit of Foreign Official 1 and others, in exchange for their assistance in securing contracts between Braskem and Petrobras, including the naphtha contract. Shortly thereafter, on or about September 9, 2011, members of the conspiracy caused approximately $1,005,800 to be transferred to a bank account held in the name of Sygnus Assets S.A. for the benefit of Foreign Official 1 and others, in exchange for their assistance in securing contracts between Braskem and Petrobras, including the naphtha contract. Both of these payments were routed through correspondent bank accounts in New York, New York.

33.     That naphtha contract between Petrobras and Braskem was finalized in approximately July 2009, but it was effective retroactively from on or about March 1, 2009. The

11

term of the contract was five years, and it expired on or about February 28, 2014. Braskem made the last payment to Petrobras pursuant to the contract on or about May 15, 2014.

>    3.    The Defendant JOSE CARLOS GRUBISICH Approved the
>          Repayment of Braskem's Bribe-Related Debt to the DSO

34.    In or about 2008, Braskem owed approximately $10 million to the DSO, because the DSO had made bribe payments on Braskem's behalf prior to receiving the money for those payments from Caixa 2. This debt left the DSO with a substantial shortfall. During an in-person conversation, Co-Conspirator 6 informed the defendant JOSE CARLOS GRUBISICH of the debt owed to the DSO, and also informed GRUBISICH that Braskem would need to make additional payments to the DSO in the coming months to avoid another shortfall in the future. GRUBISICH ultimately directed Co-Conspirator 5 to settle the debt with the DSO, and to make the additional requested payments to the DSO.

>  D.    The Defendant JOSE CARLOS GRUBISICH's Role in Concealing the Bribe
>         Payments and Falsely Certifying Braskem's Books and Records

35.    In or about and between 2006 and 2008, the defendant JOSE CARLOS GRUBISICH, together with others, took steps to misrepresent in Braskem's financial statements the true nature and purpose of the payments made by Braskem to the Caixa 2 Entities, and the subsequent transfer of those funds to the DSO for bribe payments on Braskem's behalf. In agreement with his co-conspirators, GRUBISICH, in his role as Braskem's CEO, authorized Braskem to falsely record payments diverted to the Caixa 2 Entities for onward payment to the DSO as "commissions" on, among other things, Braskem's general ledger and electronic finance system. Similarly, in agreement with his co-conspirators, GRUBISICH authorized the creation

12

of false documents to conceal the true nature and purpose of the payments to the Caixa 2

Entities, including fraudulent contracts with the Caixa 2 Entities.

36.     In both 2007 and 2008, the defendant JOSE CARLOS GRUBISICH, in

his capacity as CEO, signed written certifications to Braskem's Annual Reports, which were

filed with the SEC, on behalf of Braskem. These certifications attested to the accuracy of

Braskem's Annual Reports for the years ending in December 2006 and December 2007,

respectively. By signing these documents, GRUBISICH personally certified that Braskem fully

complied with the requirements of Sections 13(a) and 15(d) of the Exchange Act (Title 15,

United States Code, Sections 78m(a) and 78o(d)), and that the information contained in

Braskem's annual reports fairly presented, in all material respects, the financial condition and

results of operations and cash flows of Braskem. Because GRUBISICH and his co-conspirators

failed to disclose that Braskem's payments to the Caixa 2 Entities were falsely recorded as

"commissions," among other things, Braskem's annual reports did not fully comply with Section

13(a) and 15(d) of the Exchange Act, nor did they fairly represent Braskem's financial condition

and the results of its operations.

37.     The defendant JOSE CARLOS GRUBISICH also personally certified that

he had disclosed any fraud, whether or not material, that involved management or other

employees who had a significant role in Braskem's internal control over financial reporting.

GRUBISICH's certification was false because GRUBISICH was aware that Braskem was

generating funds that were being falsely reported as "commissions" payments on its books and

records, and that these funds were being used to make bribe payments on Braskem's behalf.

13

38.     Caixa 2 remained fully operational until in or around 2014, and during that time, the defendant JOSE CARLOS GRUBISICH, and later his successors, signed false certifications pursuant to the Sarbanes-Oxley Act on Braskem's behalf.

E.     The Defendant JOSE CARLOS GRUBISICH's Use of the DSO While CEO of Odebrecht's Ethanol Business

39.     After leaving Braskem, the defendant JOSE CARLOS GRUBISICH continued to communicate with the DSO about the maintenance and use of funds that were not properly recorded.  For example, from in or about and between 2008 and 2012, GRUBISICH served as the CEO of ETH, Odebrecht's ethanol business.  In this capacity, GRUBISICH communicated with the DSO regarding maintaining a slush fund for ETH and directing payments out of that slush fund.  For example, on or about August 12, 2010, Co-Conspirator 6 sent an email to a number of Odebrecht and Braskem executives, including GRUBISICH, asking the executives to provide information about their anticipated use of funds held by the DSO.  Co-Conspirator 8 was copied on the email in order to provide the requested information on behalf of Braskem, and GRUBISICH was copied in order to provide the requested information on behalf of ETH.

40.     Further, in or about September 2010, the defendant JOSE CARLOS GRUBISICH sent an email to Co-Conspirator 6 with the subject line "Support."  In that email, GRUBISICH asked Co-Conspirator 6 to arrange for the release of "100,000" in an unspecified denomination for the ETH program and further stated that another executive from ETH would sort out the details with Co-Conspirator 6.

<u>COUNT ONE</u>
(Conspiracy to Violate the FCPA—Bribery)

41.     The allegations contained in paragraphs one through 40 are realleged and incorporated as if fully set forth in this paragraph.

42.     In or about and between 2002 and December 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant JOSE CARLOS GRUBISICH, together with others, did knowingly and willfully conspire to commit offenses against the United States, to wit: being an officer, director, employee, and agent of an issuer, and a stockholder thereof acting on behalf of such issuer, to make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value, to one or more foreign officials, and to one or more persons, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised, directly or indirectly, to one or more foreign officials, for purposes of: (a) influencing acts and decisions of such foreign official in his or her official capacity; (b) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (c) securing any improper advantage; and (d) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist Braskem in obtaining and retaining business for and with, and directing business to, Braskem and its employees, agents and others, contrary to Title 15, United States Code, Sections 78dd-1, 78ff(a) and 78ff(c)(2)(a).

15

43.     In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendant JOSE CARLOS GRUBISICH, together with others, committed and caused to be committed, among others, at least one of the following:

## OVERT ACTS

(a)     In or about 2006, GRUBISICH directed Co-Conspirator 2 to negotiate bribe payments with Foreign Official 1 and Foreign Official 2 in return for Foreign Official 1 and Foreign Official 2's help in retaining contracts with Petrobras relating to the construction of a polypropylene plant by Braskem.

(b)     In or about and between 2007 and 2008, GRUBISICH asked Co-Conspirator 5 to introduce Co-Conspirator 6 to Intermediary 1.

(c)     In or about May 2007, the DSO made a payment for the benefit of Foreign Official 1 that had been authorized by GRUBISICH in exchange for Foreign Official 1's help with the contracts with Petrobras for the polypropylene plant.

(d)     In or about 2008, GRUBISICH directed Co-Conspirator 2 to initiate bribe negotiations with Foreign Official 1 and Foreign Official 2 in exchange for Foreign Official 2 and others helping Braskem obtain preferential pricing on its contract with Petrobras regarding the supply of naphtha.

(e)     In or about May 2008, several co-conspirators, including Co-Conspirator 3 and Co-Conspirator 6, communicated by email regarding GRUBISICH'S approval of an approximately $10 million transfer from Caixa 2 to the DSO to settle a bribe-related debt owed by Braskem to the DSO.

16

(f)     On or about August 26, 2011, members of the conspiracy caused $1 million to be transferred to a bank account held in the name of Sygnus Assets S.A., which was routed through correspondent bank accounts in New York, New York, for the benefit of Foreign Official 1 and others, in exchange for Foreign Official 1's assistance in securing contracts between Braskem and Petrobras, including the naphtha contract.

(g)     On or about September 9, 2011, members of the conspiracy caused approximately $1,005,800 to be transferred to a bank account held in the name of Sygnus Assets S.A., which was routed through correspondent bank accounts in New York, New York, for the benefit of Foreign Official 1 and others, in exchange for Foreign Official 1's assistance in securing contracts between Braskem and Petrobras, including the naphtha contract.

(h)     On or about April 30, 2014, members of the conspiracy caused $1,405,489.26 to be paid from a bank account in New York, New York, held by Braskem Incorporated to one of the Caixa 2 Entities.

(i)     On or about May 15, 2014, Braskem sent a payment of R$66,844,929 to Petrobras for the purchase of naphtha pursuant to the March 2009 naphtha contract.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

COUNT TWO
(Conspiracy to Violate the FCPA—Books and Records Violations and Failure to Certify Financial Reports)

44.     The allegations contained in paragraphs one through 40 are realleged and incorporated as if fully set forth in this paragraph.

17

45.     In or about and between January 2006 and April 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant JOSE CARLOS GRUBISICH, together with others, did knowingly and willfully conspire to:

(a)     directly and indirectly falsify and cause to be falsified books, records, and accounts required to, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of Braskem, an issuer of securities registered pursuant to the Exchange Act, contrary to the FCPA, Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5) and 78ff(a).

(b)     being a CEO of Braskem, an issuer, certify and cause to be certified statements required to be filed under Title 18, United States Code, Section 1350, with the SEC, knowing that the periodic reports contained financial statements accompanying the certified statements did not comport with all the requirements set forth in Sections 13(a) or 15(d) of the Exchange Act (Title 15, United States Code, Sections 78m(a) and 78o(d)), and that the information contained in each periodic report did not fully and fairly present, in all material respects, the financial condition and results of operations of Braskem, an issuer registered pursuant to the Exchange Act, in violation of Title 18, United States Code, Sections 1350(c)(1) and (2).

46.     In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendant JOSE CARLOS GRUBISICH, together with others, committed and caused to be committed, among others, at least one of the following:

18

OVERT ACTS

(a)     On or about July 6, 2006, GRUBISICH and his co-conspirators entered into a false commissions contract with one of the Caixa 2 Entities for the purpose of transferring money to Caixa 2 and later to the DSO.

(b)     On or about April 19, 2007, at the direction of and with the authorization of members of the conspiracy, Braskem falsely recorded an approximately R$589,937.38 payment that was diverted into Caixa 2 on Braskem's general ledger and electronic finance system as commission for agents.

(c)     On or about June 30, 2008, GRUBISICH signed a certification falsely attesting that he had disclosed any fraud that involved management or other employees at Braskem who had a significant role in the company's internal control over financial reporting, and that Braskem's Annual Report did not contain any false statement of a material fact or omit to state a material fact.

(d)     On or about August 24, 2010, at the direction of and with the authorization of members of the conspiracy, including Co-Conspirator 8, Braskem falsely recorded an approximately R$88,723.74 payment that was diverted into Caixa 2 on Braskem's general ledger and electronic finance system as commission for agents.

(e)     On or about June 7, 2011, Co-Conspirator 5 signed a certification falsely attesting that he/she had disclosed any fraud that involved management or other employees at Braskem who had a significant role in the company's internal control over financial reporting, and that Braskem's Annual Report did not contain any false statement of a material fact or omit to state a material fact.

(f)     On or about December 17, 2014, at the direction of and with the authorization of members of the conspiracy, including Co-Conspirator 5, Braskem falsely recorded an approximately R$229,743.31 payment that was diverted into Caixa 2 on Braskem's general ledger and electronic finance system as commission for agents.

(g)     On or about April 14, 2014, Co-Conspirator 5 signed certifications falsely attesting that he/she had disclosed any fraud that involved management or other employees at Braskem who have a significant role in the company's internal control over financial reporting, and that Braskem's Annual Report did not contain any false statement of a material fact or omit to state a material fact.

(h)     On or about April 28, 2014, members of the conspiracy caused $1,611,120.95 to be paid from a bank account in Florida held by Braskem Incorporated to one of the Caixa 2 Entities.

(i)     On or about April 30, 2014, members of the conspiracy caused $1,405,489.26 to be paid from a different bank account in New York, New York held by Braskem Incorporated to one of the Caixa 2 Entities.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

COUNT THREE
(Conspiracy to Commit Money Laundering)

47.     The allegations contained in paragraphs one through 40 are realleged and incorporated as if fully set forth in this paragraph.

48.     In or about and between 2002 and December 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant JOSE CARLOS GRUBISICH, together with others, did knowingly and intentionally conspire to

20

transport, transmit, and transfer monetary instruments and funds from a place in the United

States to and through a place outside the United States and to a place in the United States from

and through a place outside the United States with the intent to promote the carrying on of one or

more specified unlawful activities, to wit: felony violations of the FCPA, Title 15, United States

Code, Sections 78dd-1, 78m(b)(2)(A), 78m(b)(5) and 78ff(a), contrary to Title 18, United States

Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

CRIMINAL FORFEITURE ALLEGATION
AS TO COUNTS ONE AND TWO

49.     The United States hereby gives notice to the defendant that, upon his

conviction of any of the offenses charged in Counts One, Two, Four and Five, the government

will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and

Title 28, United States Code, Section 2461(c), which require any person convicted of such

offenses to forfeit any property, real or personal, constituting, or derived from, proceeds obtained

directly or indirectly as a result of such offenses.

50.     If any of the above-described forfeitable property, as a result of any act or

omission of the defendant:

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with, a third party;

(c)     has been placed beyond the jurisdiction of the court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be divided

without difficulty;

21

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

CRIMINAL FORFEITURE ALLEGATION<br>AS TO COUNT THREE

51.     The United States hereby gives notice to the defendant that, upon his conviction of the offense charged in Count Three, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which requires any person convicted of such offense to forfeit any property, real or personal, involved in such offense, or any property traceable to such property.

52.     If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with, a third party;

(c)     has been placed beyond the jurisdiction of the court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any

22

other property of the defendant up to the value of the forfeitable property described in this

forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(1) and 982(b)(1); Title 21, United

States Code, Section 853(p))


A TRUE BILL

_____
FOREPERSON


_____
RICHARD P. DONOGHUE
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK


_____
ROBERT ZINK
ACTING CHIEF, FRAUD SECTION
CRIMINAL DIVISION, DEPT. OF JUSTICE


23

F.#: 2019R00102

FORM DBD-34
JUN. 85

No.

# UNITED STATES DISTRICT COURT

EASTERN *District of* NEW YORK

CRIMINAL DIVISION

## THE UNITED STATES OF AMERICA

*vs.*

JOSE CARLOS GRUBISICH,

Defendant.

## INDICTMENT

(T. 15, U.S.C., §§ 78dd-1, 78ff(a) and 78ff(c)(2)(a); T. 18, U.S.C., §§ 2, 371, 981(a)(1)(C), 982(a)(1), 982(b)(1), 1956(h) and 3551 et seq.; T. 21, U.S.C., § 853(p); T. 28, U.S.C., § 2461(c))

*A true bill.*

_____ Catherine May _____ _____

*Foreperson*

*Filed in open court this* _____ *day,*

*of* _____ *A.D. 20* _____

_____ __

*Clerk*

*Bail,* $ _____

_____



*Julia Nestor and Alixandra E. Smith, Assistant U.S. Attorneys (718) 254-6297/6370*

