**KRIEGER KIM & LEWIN** LLP

500 Fifth Avenue  
New York, NY 10110

Telephone: (212) 390-9550  
www.KKLllp.com

November 26, 2019

<u>By ECF</u>

The Honorable Steven M. Gold  
United States Magistrate Judge  
Eastern District of New York  
225 Cadman Plaza East  
Brooklyn, NY 11201

     Re: *United States v. Jose Carlos Grubisich*, 19 Cr. 102 (RJD)

Dear Judge Gold:

  We represent Mr. Jose Carlos Grubisich, a 62-year-old Brazilian national who has been held at the Metropolitan Detention Center ("MDC") since his arrest on November 20, 2019. We respectfully request that Mr. Grubisich be released from pretrial detention on strict conditions.

  As set forth below, Mr. Grubisich is neither a danger to the community nor a flight risk. He is an internationally respected business leader whose livelihood and legacy are rooted in his good name, which he has worked decades to build. Mr. Grubisich wants nothing more than to defend this case and clear his name. Life as a fugitive is not an option for him.

  The conditions we propose are strict, and they will reasonably assure Mr. Grubisich's appearance in court. Specifically, we propose that Mr. Grubisich be subject to electronic monitoring and home confinement and that his release be secured by a personal recognizance bond of $5 million that would be co-signed by four financially responsible persons and secured by $500,000 in cash and a property in the United States with an estimated value of $1 million.

  The government maintains that Mr. Grubisich should be detained because of the purported strength of the evidence against him and because he is a man of significant financial resources who is a citizen of Brazil, which does not extradite its citizens. However, as set forth below, even if Mr. Grubisich wanted to flee—and he categorically does not—Mr. Grubisich has no plausible refuge in Brazil or anywhere else. In addition, similarly situated defendants are routinely granted bail, and Mr. Grubisich's history and characteristics demonstrate that he has every incentive to face the charges against him. Finally, given the nature of the government's case, Mr. Grubisich will not be able to meaningfully participate in his defense if he is detained.

### I.     BACKGROUND

#### A.     Relevant Facts

##### 1.     Background and Early Career (1957-2002)

Mr. Grubisich is an internationally prominent businessman. Time and time again, he has been entrusted with positions of responsibility by companies in Brazil, France, and the United States, and he has consistently served with distinction. After decades of success in the corporate world, Mr. Grubisich recently set out to build a new business with his two children, Bruno and Bianca, through which he hopes both to transition his experience and contacts to his children and bring innovations in agricultural technology and genomics to his home country.

Mr. Grubisich was born in 1957 in the small town of Itatinga, in the state of São Paulo, Brazil. He grew up in a humble, middle-class family and, in 1975, moved to the city of São Paulo to attend Oswaldo Cruz University. He attended evening classes and worked during the day to help cover his expenses. While still in school, he started an entry-level trainee position at Rhodia, a multinational company affiliated with the French conglomerate formerly known as Rhône-Poulenc. He graduated in 1980 with a degree in chemical engineering.

Mr. Grubisich spent much of his career at Rhodia, where he focused on the development and marketing of chemicals and pharmaceuticals. He was repeatedly recognized by the company for his outstanding performance and leadership. Between 1976 and 2001, Mr. Grubisich rose from trainee; to foreign trade manager; to international product manager; to managing director; to head of Rhodia's South American agrochemical business; to CEO of Rhodia Brazil; and, finally, to vice president of Rhodia's worldwide operations.

##### 2.     Tenure at Braskem (2002-2008)

In 2002, Mr. Grubisich left Rhodia to become CEO of Braskem S.A. ("Braskem"), a petrochemical company that had been recently established by the Brazilian conglomerate Odebrecht S.A. ("Odebrecht"). Mr. Grubisich had no pre-existing connection to Odebrecht, the Odebrecht family, or its associates. As a controlling shareholder, Odebrecht directly controlled many of Braskem's corporate activities without input from Mr. Grubisich. After Mr. Grubisich was publicly critical of a deal that the Brazilian state-run oil and gas company Petróleo Brasileiro S.A. ("Petrobras") had entered into with the petrochemical company Suzano Petroquimica, Odebrecht removed Mr. Grubisich from his position.

##### 3.     Subsequent Employment (2002-2019)

In 2008, Mr. Grubisich became CEO of ETH Bioenergia ("ETH"), a renewable energy company controlled by Odebrecht and other international companies that produces ethanol and electricity from Brazilian sugarcane. ETH did not do business with Petrobras or any other state-

run companies during Mr. Grubisich's tenure, has never been listed on the New York Stock Exchange, and has no material connection to the offenses charged in the indictment.[1]

Mr. Grubisich has not rendered any meaningful services to an Odebrecht-affiliated entity since he stepped down as CEO of ETH in 2012.  From 2012 to 2017, he was CEO of Eldorado Brasil Celulose S.A., a Brazilian pulp manufacturer.  Until last year, Mr. Grubisich also served on the boards of two multinational companies—Vallourec S.A., headquartered in France, and Halliburton Company, headquartered in the United States.

Mr. Grubisich currently runs three separate companies, in partnership with his son and daughter: Olímpia Investimentos e Participações ("Olímpia"), Verdana Agropecuária, and Seleon Biotecnologia.  The companies' business interests include animal reproduction and genomics, bioproducts, and agricultural technology.

### 4. Family and Community Involvement

Even while building a successful professional career, Mr. Grubisich has always been deeply committed to his family.  The fruits of that labor are evident today.  He and his wife, Katia, have been happily married for over 37 years.  Together, they raised a son, Bruno, and daughter, Bianca, who remain close and are deeply devoted to their parents.  Mr. Grubisich is a loving son to his 81-year old mother, and he dotes on his two granddaughters, ages eight months and two years.  Mr. Grubisich has the full support of his family, and his wife intends to stay with him in New York to support him as he faces the charges against him.  In addition, prior to Mr. Grubisich's arrest, Bruno rented a residence in California, where he is scheduled to begin an executive program at the Stanford Graduate School of Business in January.

Aside from his professional and family commitments, Mr. Grubisich has devoted substantial, unpaid time to non-profit organizations throughout his career.  He has served as president and chairman of the board of the French Alliance in São Paulo; as a board member of the Abrinq Foundation, dedicated to improving schools and children's health throughout Brazil; and as the Brazil-based chairman of a group focused on improving trade relations between Brazil and France.

### 5. Lava Jato

As this Court is aware, in March 2014, news broke of a bribery and money laundering investigation originating in Brazil and centered around projects and contracts involving Petrobras.  Known as "Lava Jato," or "Car Wash," the Brazilian investigation led to the arrests of dozens of prominent Brazilian business leaders and politicians.  Lava Jato prompted public

---

[1] Paragraphs 39 and 40 of the indictment allege that, while serving as CEO of ETH, Mr. Grubisich was involved in directing unspecified "payments" out of a "slush fund" that Odebrecht maintained.  *See* Indictment, ECF No. 1, ¶¶ 39–40.  The most specific allegation in these paragraphs is that Mr. Grubisich requested the release of "100,000" in an unspecified denomination, from an unspecified source, to an unspecified destination, for an unspecified purpose—possibly, for "support."  *See id.* ¶ 40.

outrage, widespread protests, and political upheaval in Brazil, and sparked investigations throughout South America and around the world. Several members and associates of the Odebrecht family were criminally convicted in Brazil. Odebrecht and Braskem pleaded guilty to violations of the Foreign Corrupt Practices Act ("FCPA") on December 21, 2016. Exhibit A. The Court approved fines in connection with the Braskem and Odebrecht plea agreements on January 26, 2017 and April 17, 2017, respectively. *United States v. Braskem S.A.*, No. 16 Cr. 644 (RJD), ECF No. 18; *United States v. Odebrecht S.A.*, No. 16 Cr. 643 (RJD), ECF No. 17.

Mr. Grubisich's former leadership position at Braskem drew attention to him immediately after Lava Jato became public. Brazilian authorities eventually initiated an offshoot of the Lava Jato investigation, into matters substantially similar to those at issue in this case (the "Brazilian Probe"). Exhibit B, ¶¶ 6–7. Mr. Grubisich is represented by Brazilian counsel in connection with the Brazilian Probe, which, in the assessment of Mr. Grubisich's counsel, is investigating potential offenses of money laundering and illegal maintenance of funds abroad. *Id.* ¶ 7. In Brazil, the maximum combined prison sentence for those offenses is 16 years. To date, Mr. Grubisich has not been charged in connection with that investigation.

### B. Procedural History

On February 27, 2019, the government obtained a sealed indictment charging Mr. Grubisich with violations of the FCPA and money laundering offenses. *See generally* Indictment. On November 20, 2019, he was arrested after he and his wife arrived on a commercial flight at John F. Kennedy International Airport for a one-week vacation in New York City. Later that same day, Mr. Grubisich was presented before Your Honor and detained on consent.

## II. ARGUMENT

### A. Legal Standard

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). "Because the law . . . generally favors bail release, the government carries a dual burden in seeking pre-trial detention." *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007). The government must first "establish by a preponderance of the evidence that the defendant, if released, presents an actual risk of flight." *Id.* If this burden is satisfied, "the government must then demonstrate by a preponderance of the evidence that no condition or combination of conditions could be imposed on the defendant that would reasonably assure his presence in court." *Id.*

"[I]n determining whether there are conditions of release that will reasonably assure the appearance of" a defendant, courts consider four factors: (1) the nature and circumstances of the offense; (2) the weight of the evidence; (3) the history and characteristics of the person; and (4) the nature and seriousness of any danger posed. 18 U.S.C. § 3142(g). "In applying the factors to any particular case, the court should bear in mind that it is only a limited group of offenders who should be denied bail pending trial." *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987) (quotation marks omitted). Detention is only appropriate if "no conditions or

combination of conditions will reasonably assure the appearance of the [defendant] as required," 18 U.S.C. § 3142(e), and when imposing conditions, courts must select "the least restrictive . . . condition, or combination of conditions, that [the court] determines will reasonably assure" the defendant's appearance, *id.* § 3142(c)(1)(B). "Only in rare cases should release be denied, and doubts regarding the propriety of release are to be resolved in favor of the defendant." *United States v. Santos-Flores*, 794 F.3d 1088, 1090 (9th Cir. 2015).

### B.     If Released, Mr. Grubisich Will Appear

#### 1.     Mr. Grubisich Has No Plausible Refuge and No Incentive to Flee

Mr. Grubisich has no desire to flee and every incentive to face the charges against him. But even if he wanted to flee, he would have nowhere to run. In fact, if he were to abscond and flee to Brazil, as the government suggests he might, the threats to Mr. Grubisich's freedom and security would be even greater in Brazil than they are in this country.

As an initial matter, Mr. Grubisich's prominence in Brazil, coupled with the intense public scrutiny of this case there, would render it impossible for him to hide in Brazil, much less enter it undetected. Moreover, any attempt by Mr. Grubisich to flee the United States would dramatically increase his risk of arrest and imprisonment in Brazil. *See* Exhibit B ¶ 8.

In addition, the Brazilian Probe's investigation of Mr. Grubisich, in which he has not been charged, would be less defensible, as Brazilian prosecutors could use Mr. Grubisich's flight from U.S. prosecution as strong evidence of Mr. Grubisich's guilt. American and Brazilian authorities have worked closely together throughout the lengthy investigation of Odebrecht, which culminated in a coordinated resolution involving both governments in December 2016. Exhibit A. That cooperation has extended to this case, in which the Brazilian Ministerio Publico Federal and Departamento de Polícia Federal "provided significant cooperation." Exhibit C. Given the already-close coordination between American and Brazilian law enforcement authorities in this case, as well as the intense public scrutiny of this case in Brazil, Mr. Grubisich could face immediate arrest if he were to flee to Brazil. And the pressure to pursue a conviction and harsh penalties against Mr. Grubisich would be overwhelming.

In short, Mr. Grubisich would almost certainly fare worse in the criminal justice system of Brazil, where public outrage surrounding Lava Jato remains intense, where criminal defendants generally enjoy more limited procedural rights, where other defendants associated with Lava Jato have received significant prison sentences of up to 145 years, and where conditions in prisons are notoriously harsh.[2] *See, e.g.*, Robert Muggah and Ilona Szabó de Carvalho, "Brazil's Deadly Prison System," N.Y. TIMES, January 4, 2017, at A1.

---

[2] Understanding and respecting that sentencing decisions are squarely within the province of the Court, we note that the government's guidelines estimate of 30 years far exceeds the range of sentences typically imposed for violations of the FCPA and related money laundering offenses. *See, e.g.*, "Key Statistics from 1977 to Present," Stanford Law School Foreign Corrupt Practices Act Clearinghouse, http://fcpa.stanford.edu/statistics-keys.html (accessed Nov. 25, 2019).

It is thus immaterial that Brazil does not extradite its own citizens because Brazil would offer no refuge to Mr. Grubisich. The government does not, and cannot, argue that Mr. Grubisich could plausibly take refuge in any other country. If he were to somehow leave the United States, a Red Notice would follow him wherever he went, putting him at risk of arrest in every country in which he could conceivably live. For Mr. Grubisich, a life spent roaming foreign lands as a solitary fugitive would not be a life worth living.

### 2. Similarly Situated Defendants Are Routinely Granted Bail

The presumption of bail applies to citizens and non-citizens alike. As noted above, the factors to be considered in determining whether to detain a defendant are set forth in 18 U.S.C. § 3142(g). These factors do not include immigration status, and alienage certainly cannot be dispositive in a bail determination. *See Santos-Flores*, 794 F.3d at 1090. Nor is national origin a substitute for proving an actual intent to flee. *See United States v. Hung*, 439 U.S. 1326, 1329 (1978) (holding that although a convicted Vietnamese defendant held pending appeal had "not established a permanent residence in this country; and[,] should applicant flee to Vietnam, the United States would have no means to procure his return[,] . . . these considerations suggest opportunities for flight, they hardly establish any inclination on the part of applicant to flee.").

In fact, instances in which non-citizens in white collar cases have been granted bail are too numerous to exhaustively list. The government has argued that Mr. Grubisich's wealth, lack of citizenship, and residence outside of the United States make this the type of rare case where bail should be denied. However, a review of relevant precedent from this Court and others demonstrates otherwise. Courts routinely grant bail to defendants like Mr. Grubisich, including in cases where individuals hale from countries that do not extradite their own citizens.

In the Fédération Internationale de Football Association ("FIFA") corruption case, every defendant who appeared was ultimately granted bail, and nearly all of those defendants were foreign nationals, many from countries, including Brazil, that do not extradite their citizens. *See generally United States v. Webb*, No. 15 Cr. 252 (E.D.N.Y.) (PKC). And notably, every single defendant who was granted bail in that case subsequently appeared in court.

Other courts within this Circuit routinely grant bail to similarly situated defendants. For instance, in *United States v. Bodmer*, a wealthy Swiss national who was charged with bribery and money laundering offenses in connection with Azerbaijani oil transactions was granted bail over the government's objection. No. 03 Cr. 947 (SAS), 2004 WL 169790, at *3 (S.D.N.Y. Jan. 28, 2004). Bodmer was permitted to reside with friends in the District of Columbia in advance of his trial. *Id.* at *1. Similarly, in *United States v. Benhamou*, a wealthy French national who was charged with insider trading was granted bail over the government's objection. *See* Exhibit D at 4:6–7:25, 23:25.[3] Benhamou did not have a place to stay in New York City, so he was ordered to rent a suitable apartment. *Id.* at 24:18–23. Neither of these defendants was a U.S. resident, and both were citizens of countries that did not extradite their own nationals.

---

[3] All transcript exhibits are excerpts. The complete transcripts are available upon request.

In *United States v. Chan*, a wealthy Taiwanese national who resided in Singapore was granted bail over the government's objection in an accounting fraud case, despite the fact that he had not visited the United States in sixteen years prior to the trip during which he was arrested. *See* Exhibit E at 9:25–10:1, 23:6–8, 25:9–22. Chan had to buy an apartment in New York in which to stay. *See id.* at 11:16–21. Mr. Grubisich similarly would rent an apartment if he is granted bail. In *United States v. Rosenthal*, a former Honduran cabinet official charged with money laundering was granted bail despite the fact that there was no lawful basis for his presence in the United States at the time of the bail application. *See* Exhibit F at 1.

In *United States v. Hansen*, the Sixth Circuit affirmed a district court order releasing a defendant charged with bulk cash smuggling who was a citizen and resident of Denmark. 108 F. App'x 331 (6th Cir. 2004). The defendant was permitted to stay in Denmark during the pendency of the case. *Id.* In *United States v. Gadola*, *United States v. Bagios*, *United States v. Lack*, and *United States v. Weil*, Swiss bankers who were charged with tax offenses in the Southern District of Florida were granted bail despite lacking ties to the United States. *See* Exhibit G; Exhibit H at 13:17–20, 59:23–24; Exhibit I at 4:8–5:1; Exhibit J at 38:11–12.

In *United States v. Flotron*, a citizen of Switzerland, which does not extradite its nationals, was granted bail while awaiting trial on charges of wire fraud and commodities fraud. *See* Order Setting Conditions of Release, No. 17 Cr. 220 (D. Conn. Sept. 22, 2017), ECF No. 10, at 2.

In *United States v. Seng*, a Chinese national and billionaire with significant ties to the Chinese government was granted bail while awaiting trial on FCPA bribery charges. *See* Order, No. 15 Cr. 706 (S.D.N.Y. October 23, 2015), ECF No. 570.

Mr. Grubisich has more significant ties to the United States than many of these defendants. Mr. Grubisich has done business in this country for decades, and his work has brought him to the United States on countless occasions. In the last five years alone, Mr. Grubisich has traveled to the United States on 26 separate occasions. Exhibit K. In fact, Mr. Grubisich has recently availed himself of the U.S. legal system through arbitration he initiated against Odebrecht, which remains pending. Moreover, prior to Mr. Grubisich's arrest, his son had rented a residence in California, where he is scheduled to begin an executive program in January.

        3.      <u>The Government's Arguments to the Contrary Are Misplaced</u>

The government relies heavily on the fact that Brazil does not extradite its own citizens. However, "[t]he bail statute does not . . . require that foreign defendants be detained simply because their return cannot be guaranteed through extradition." *Hansen*, 108 F. App'x at 332; *see also Bodmer*, 2004 WL 169790, at *2 (granting bail to a Swiss national and rejecting the government's argument that he should be detained because of the Swiss government's refusal to extradite its citizens "because if [the argument were] taken to its logical conclusion, no Swiss national would ever be eligible for bail"). Other than speculative statements regarding

Mr. Grubisich's personal wealth,[4] the government points to no other characteristics of Mr. Grubisich that suggest he poses a flight risk.

To the contrary, Mr. Grubisich has already demonstrated that he will not flee prosecution. Mr. Grubisich has lived in Brazil for years in the face of the Brazilian Probe's focus on the same events at issue here. That investigation could have resulted in his being charged and arrested at any moment. Indeed, for the many other executives at Odebrecht and Braskem who are now incarcerated, it did. Yet Mr. Grubisich made no attempt to escape.

Nor has Mr. Grubisich avoided the jurisdiction of the United States, despite his knowledge of the guilty pleas of Odebrecht and Braskem. The widely reported December 2016 plea agreements between the companies and the DOJ involved charges substantially related to the charges now pending against Mr. Grubisich, in which the companies agreed to "cooperat[e] with law enforcement . . . in connection with the investigations and prosecutions of individuals responsible for the criminal conduct." Exhibit A. Since that time, Mr. Grubisich has traveled to the United States eleven times. Exhibit K. Indeed, he also had been scheduled to return to the United States next month for his arbitration against Odebrecht.

The cases cited by the government are inapposite. None of them discuss the strong disincentives to flight posed by a parallel criminal investigation in the foreign national's country of origin. Additionally, many of the cases cited by the government involved exceptional circumstances not present here that suggested a far more significant risk of flight. *See, e.g., United States v. Boustani*, 18 Cr. 681 (WFK) (E.D.N.Y. 2018) (defendant had falsified travel documents and had never been to the United States); *United States v. Thiam*, 17 Cr. 47 (VM) (S.D.N.Y. 2017) (defendant failed to report millions of dollars of assets to Pretrial Services and had contacts with foreign officials who could provide him travel documents and safe haven), *United States v. Pierucci*, 12 Cr. 238 (JBA) (D. Conn. 2013) (defendant's proposed bond was a corporate bond offered by an unindicted co-conspirator, and defendant had taken the "extremely rare step" of *actively* giving up his U.S. immigration status prior to being arrested); *United States v. Schmidt*, 16 Cr. 20394 (SFC) (E.D. Mich. 2017) (defendant had lied to investigators and destroyed evidence).

    4.   Mr. Grubisich Has Every Incentive to Face the Charges in this Case

Mr. Grubisich has spent his life building his reputation. The success he has enjoyed is a direct result of that reputation. And in this latest chapter of his professional life, he has focused on building a business with his son and daughter. His business endeavors and—more significantly for Mr. Grubisich—his children's professional success, are dependent upon Mr. Grubisich's reputation.

---

[4] For example, the government asserts that Olímpia, one of Mr. Grubisich's companies, will invest one billion reais ($238 million). Nov. 20, 2019 Letter, ECF No. 10, at 6. Although Mr. Grubisich hopes to raise and invest that amount for Olímpia, the company has not yet begun raising funds and, in any event, would raise virtually all of those funds from outside investors.

To flee the United States would destroy Mr. Grubisich's reputation, as well as everything he holds dearest: his relationships with family and friends; the businesses he has created and nurtured with his children; his future plans for professional and intellectual fulfillment; and his economic security.  He would not be able to work, and his travel would be restricted to the limited number of countries that do not recognize Interpol Red Notices.  His life as he knows it would be destroyed.

Mr. Grubisich's arrest has been reported internationally and is known throughout his personal and professional networks.  Any attempt to flee would be tantamount to an admission of guilt, would dishonor Mr. Grubisich and his family, and would have even more devastating consequences for him than would a conviction following trial.  Furthermore, Mr. Grubisich's prosecution in the United States is being closely followed in Brazil.  Flight is not an option, and Mr. Grubisich's overriding concern in connection with this case is to clear his name.

Finally, Mr. Grubisich's incentive to fight the charges against him is especially compelling in light of the significant deficiencies that are apparent even at the outset of the government's case.  Notably, despite charging numerous other individuals in connection with the Lava Jato investigation, the Brazilian authorities have thus far not brought any charges against Mr. Grubisich.  In addition, we anticipate substantial pretrial motion practice related to a number of flaws in the government's charging theories.  Even accepting the allegations set forth in the indictment, the ten-year period between the date of the last act alleged to have been committed by Mr. Grubisich and the date of the indictment in this case, raises serious questions about the statute of limitations and violations of due process.

### C. Continued Detention Would Cripple Mr. Grubisich's Ability to Prepare a Defense

Given the nature of the government's case, another consideration should weigh heavily here: Mr. Grubisich's ability to prepare a defense.  Discovery in this case likely will represent the culmination of the collective investigative efforts of numerous law enforcement authorities, spanning several countries, multiple languages, and relevant events stretching over at least five— and possibly as many as ten—years.  The defense team will need to rely heavily on Mr. Grubisich to assist in the identification of significant documents, many of which will be written in Portuguese.  This is of course a challenging task in any white collar criminal investigation, but the specific circumstances of this case make it particularly difficult here.  Mr. Grubisich left Braskem over a decade ago and no longer has access to corporate records that could be useful to his defense.  Moreover, Odebrecht is not likely to assist in any of Mr. Grubisich's efforts, particularly given the fact that he is currently engaged in arbitration against the company.  In short, it will be nearly impossible for Mr. Grubisich to assist in the review of documents within any reasonable time if he is confined to the MDC.

Preparation of Mr. Grubisich's defense will also require his active participation in, among other things, identifying and introducing the defense team to potential witnesses in Brazil and elsewhere.  That cannot be accomplished from an MDC payphone.

In light of the extraordinary amount of time and resources that have been assembled against Mr. Grubisich, it is essential that he be permitted to prepare his defense with the constant and efficient access to counsel, technology, and information that he can only receive outside of jail.  *See Barker v. Wingo*, 407 U.S. 514, 533 (1972) ("[I]f a defendant is locked up, he is hindered in his ability to gather evidence, contact witnesses, or otherwise prepare his defense."); *Bodmer*, 2004 WL 169790, at *3 ("It will be far easier for [the defendant] to assist his counsel in reviewing and responding to discovery if counsel has regular, uninterrupted access to him.").

### D. The Proposed Conditions Will Reasonably Assure Mr. Grubisich's Appearance

Even if the Court concludes that Mr. Grubisich is a flight risk, he must be released so long as there are conditions that will reasonably assure his appearance.  18 U.S.C. § 3142(e); *see also United States v. Berrios-Berrios*, 791 F.2d 246, 251 (2d Cir. 1986) ("[M]any courts have set bail for defendants despite their propensity to flee.").  The proposed conditions will do that.

In addition to the financial conditions discussed above, Mr. Grubisich is prepared to submit to home confinement in New York City with electronic monitoring.  Home confinement with electronic monitoring is an extraordinarily burdensome form of "release" with a very high success rate, particularly among white collar defendants.  In the Southern District of New York, for example, in the twelve-month period ending September 30, 2017, there were failure-to-appear violations in just 0.69% of the 1,880 cases in which defendants were released pending trial.  *See* Exhibit L.  Many of those defendants were released under much less severe restrictions than we propose for Mr. Grubisich.  This is not one of the rare cases where detention is appropriate or necessary.  Mr. Grubisich should be released under the proposed conditions.

          Respectfully submitted,
          KRIEGER KIM & LEWIN LLP

By: _____
     Edward Y. Kim
     Henry L. Ross

Encls.

cc:    AUSA Alixandra Smith
       AUSA Julia Nestor
       Assistant Chief Lorinda Laryea
       Trial Attorney Leila Babaeva