UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                   :

UNITED STATES OF AMERICA          :

                                   :        No. 19 Cr. 102 (RJD)

                v.                   :

JOSE CARLOS GRUBISICH,          :

                                   :

                         Defendant.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## DEFENDANT'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF HIS MOTIONS TO DISMISS THE INDICTMENT AND TO COMPEL PRODUCTION OF A BILL OF PARTICULARS

BRACEWELL LLP
1251 Avenue of the Americas, 49th Floor
New York, New York 10020
Tel.: (212) 508-6100

KRIEGER KIM & LEWIN LLP
500 Fifth Avenue, 34th Floor
New York, New York 10110
Tel.: (212) 390-9550

*Attorneys for Jose Carlos Grubisich*

# TABLE OF CONTENTS

Introduction...................................................................................................................1

Argument .....................................................................................................................2

    COUNT ONE SHOULD BE DISMISSED, OR AT A MINIMUM SEVERED,
    AS DUPLICITOUS ................................................................................................2

    COUNT TWO SHOULD BE DISMISSED BECAUSE MR. GRUBISICH
    WITHDREW FROM THE BOOKS AND RECORDS CONSPIRACY IN 2008
    AS A MATTER OF LAW......................................................................................5

    COUNT THREE SHOULD BE DISMISSED ON SEVERAL GROUNDS ...................6

        A.    Mens Rea ...................................................................................7

        B.    Extraterritoriality...................................................................11

        C.    Due Process............................................................................13

    THE GOVERNMENT SHOULD BE COMPELLED TO PRODUCE A BILL OF
    PARTICULARS CLARIFYING THE INDICTMENT ...................................................15

        A.    Bribery Conspiracies..............................................................15

        B.    Transfers of Funds .................................................................16

Conclusion ..................................................................................................................18

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*Bouie v. City of Columbia,*
    378 U.S. 347 (1964) .................................................................................................. 14

*Henslee v. Union Planters Nat'l Bank & Tr. Co.,*
    335 U.S. 595 (1949) .................................................................................................. 11

*Morrison v. Nat'l Australia Bank Ltd.,*
    561 U.S. 247 (2010) ............................................................................................ 11, 12

*Rehaif v. United States,*
    139 S. Ct. 2191 (2019) ............................................................................................... 8

*Salinas v. United States,*
    522 U.S. 52 (1997) ..................................................................................................... 7

*S.E.C. v. Straub,*
    921 F. Supp. 2d 244 (S.D.N.Y. 2013) .................................................................... 16

*Torres v. Lynch,*
    136 S. Ct. 1619 (2016) .......................................................................................... 8, 10

*United States v. Al Kassar,*
    660 F.3d 108 (2d Cir. 2011) ................................................................................ 13, 14

*United States v. All Assets Held at Bank Julius Baer & Co., Ltd.,*
    571 F. Supp. 2d 1 (D.D.C. 2008) .............................................................................. 9

*United States v. Allen,*
    788 F.3d 61(2d Cir. 2015) ........................................................................................ 10

*United States v. Anderson,*
    747 F.3d 51 (2d Cir. 2014) ....................................................................................... 10

*United States v. Antar,*
    53 F.3d 568 (3d Cir. 1995) ........................................................................................ 6

*United States v. Aracri,*
    968 F.2d 1512 (2d Cir. 1992) ........................................................................... 2, 3, 4

*United States v. Balde,*
    943 F.3d 73 (2d Cir. 2019) ..................................................................................... 7, 8

*United States v. Bortnovksy,*
    820 F.2d 572 (2d Cir. 1987)................................................................. 17

*United States v. Bout,*
    731 F.3d 233 (2d Cir. 2013)................................................................. 8

*United States v. Carll,*
    105 U.S. 611 (1881)........................................................................... 7

*United States v. Carroll,*
    510 F.2d 507 (2d Cir. 1975)................................................................. 16

*United States v. Estrada,*
    320 F.3d 173 (2d Cir. 2003)................................................................. 4

*United States v. Foley,*
    73 F.3d 484 (2d Cir. 1996)................................................................... 7

*United States v. Greenfield,*
    44 F.3d 1141 (2d Cir. 1995)................................................................. 6

*United States v. Gunn,*
    366 F. App'x 215 (2d Cir. 2010) .......................................................... 4

*United States v. Hoskins,*
    73 F. Supp. 3d 154 (D. Conn. 2014)................................................ 6, 11

*United States v. Hoskins*
    No. 12 Cr. 238 (JBA)(D. Conn. Nov. 2, 2019), ECF No. 600........................ 11

*United States v. Hoskins,*
    2020 WL 914302 (D. Conn. 2020) ........................................................ 11

*United States v. Jamal Yousef,*
    2010 WL 3377499 (S.D.N.Y. 2010)........................................................ 13

*United States v. L.A. Tucker Truck Lines, Inc.,*
    344 U.S. 33 (1952)............................................................................. 11

*United States v. Leslie,*
    658 F.3d 140 (2d Cir. 2011)................................................................. 6

*Unites States v. Macchia,*
    35 F.3d 662 (2d Cir. 1994)............................................................... 3, 4

*United States v. Mostafa,*
    965 F. Supp. 2d 451 (S.D.N.Y. 2013) ................................................................. 13

*United States v. Murgio,*
    209 F. Supp. 3d 698 (S.D.N.Y. 2016) ................................................................. 15

*United States v. Nerlinger,*
    862 F.2d 967 (2d Cir. 1988) ................................................................................. 6

*United States v. Piervinanzi,*
    23 F.3d 670 (2d Cir. 1994) ................................................................................... 9

*United States v. Ramzi Yousef,*
    327 F.3d 56 (2d Cir. 2003) ............................................................................ 13, 14

*United States v. Sidorenko,*
    102 F. Supp. 3d 1124 (N.D. Cal. 2015) ........................................................ 13, 14

*United States v. Torres,*
    901 F.2d 205 (2d Cir. 1990) ............................................................................... 16

*United States v. Urso,*
    369 F. Supp. 2d 254 (E.D.N.Y. 2005) .......................................................... 15, 16

*United States v. X-Citement Video, Inc.,*
    513 U.S. 64 (1994) ............................................................................................. 11

*Wapnick v. United States,*
    355 F.2d 136 (2d Cir. 1966) ............................................................................... 10

*Whitfield v. United States,*
    543 U.S. 209 (2005) ........................................................................................... 11

**Statutes**

18 U.S.C. §1956 ............................................................................................................ 11

18 U.S.C. §1956(a)(2)(A) ..................................................................................... *passim*

18 U.S.C. §1956(a)(1)(A)(i) .......................................................................................... 9

18 U.S.C. §1956(a)(3)(A) .............................................................................................. 9

18 U.S.C. §1956(f) .................................................................................................. 11, 12

18 U.S.C. §1956(h) ...................................................................................................... 11

18 U.S.C. §2311 *et seq.*...........................................................................................................10

**Other Authorities**

1 C. Wright & A. Miller, <u>Fed. Practice and Procedure: Crim.</u> (4th ed. 2015)..............................7

Model Penal Code §1.13(10) ...................................................................................................8

This reply brief is respectfully submitted in further support of Jose Carlos Grubisich's pre-trial motions.

## Introduction

In its response, the government writes that "[t]he Indictment alleges that from about 2002 to 2014, [Mr. Grubisich], together with other Braskem and Odebrecht employees and agents, diverted approximately $250 million of Braskem's funds into a secret slush fund, in part to pay bribes to government officials and political parties in Brazil so that Braskem could obtain and retain business." G. Opp. 2. In an effort to tie Mr. Grubisich to this vast web of purported misconduct, the government articulates an unbounded view of the scope of the conspiratorial agreement: "[t]he defendant is charged with agreeing with others to pay bribes to government officials, whenever necessary, to advance Braskem's economic interests." G. Opp. 11. Thus, for the government, any bribe paid by Braskem to any public official after Mr. Grubisich was removed as its Chief Executive Officer ("CEO") would fall within the scope of the agreement.

To date, however, the government has identified only two bribery schemes, involving bribes totaling approximately $16 million, in which it alleges Mr. Grubisich actually participated. One of those schemes is clearly time-barred, and all of the alleged conduct is too old to have been charged as a substantive offense.

The government's framing of its case reveals the strategy that it intends to employ at a trial in this case: to bury Mr. Grubisich in a mountain of evidence about bribery schemes in which he had no conceivable role. If the trial of this case focuses only on the one bribery scheme that is arguably not time barred and in which Mr. Grubisich allegedly participated personally -- the Naphtha Contract Scheme -- the government's case will fail. Our motions, in large part, seek to enlist the Court to rein in the government, so that a trial of this case will be fair.

## <u>Argument</u>

## COUNT ONE SHOULD BE DISMISSED, OR AT A MINIMUM SEVERED, AS DUPLICITOUS

In our opening brief, we argued that Count One -- the FCPA conspiracy -- is fatally duplicitous.  As discussed below, the government's response is lengthy but unpersuasive.

1.  Our argument is that the Polypropylene Plant Scheme and the Naphtha Contract Scheme were separate conspiratorial agreements.  The Polypropylene Plant Scheme ended in 2008, when Costa and Janene were paid, and would be time barred if properly pleaded as a separate conspiracy.  Thus, this is not a garden variety case in which a defendant who prevails on a duplicity claim may gain little.  The issue here is of paramount importance to this case.

2.  The government's principal argument is that resolution of our duplicity claim is premature because it poses "a question of fact for a properly instructed jury."  G. Opp. 10 (citing <u>United States v. Aracri</u>, 968 F.2d 1512 (2d Cir. 1992)).  A close look at <u>Aracri</u>, however, shows that the government is wrong.  There, the defendants created a scheme to avoid paying gasoline taxes by setting up a paper trail of sham sales.  <u>Aracri</u>, 968 F.2d at 1515.  The companies involved in the sham sales changed over time as authorities grew suspicious and intervened.  <u>Id.</u>  When the defendants were indicted for conspiracy to defraud the United States, they argued that the conspiracy count was duplicitous because it lumped together multiple distinct conspiracies (one for each of the companies involved) in a single count.

On appeal of the defendants' trial convictions, the Second Circuit rejected that claim.  Tellingly, it did so in two steps.  It first found that "[t]he charged conspiracy clearly could be characterized as one continuing scheme that involved utilizing different companies . . . in a series of transfers all for the single purpose of concealing the non-payment of taxes . . . ."  <u>Id.</u> at 1519.  Based on that finding, it concluded that "the essence of the crime charged in [the conspiracy

count] is a single scheme to defraud the United States [and therefore] the indictment is not duplicitous." Id. Only then did the Court proceed to the second step -- consideration of whether "the evidence at trial proved one conspiracy [the one charged in the indictment] or proved multiple conspiracies." Id. And only then did it observe that "[w]hether the government has proved a single conspiracy or . . . multiple other independent conspiracies is a question of fact for a properly instructed jury." Id.

Our contention is that the essence of the FCPA crime for which Mr. Grubisich is charged is two conspiracies, not one, and that, under Aracri, that is an issue for the court to decide on pre-trial motion. We are at step one of the Aracri framework. The government's argument for one conspiracy -- that Mr. Grubisich agreed with others in 2002 "to pay bribes to [Brazilian] officials, whenever necessary to advance Braskem's economic interest," G. Opp. 11 -- is pure fiction. At most the Indictment alleges (i) that Braskem executives agreed in 2006 to pay bribes to Brazilian officials to maintain its contract to construct the polypropylene plant and (ii) in 2008 or 2009, Braskem executives (some the same, some different) agreed to pay Brazilian officials to gain favorable terms on a naphtha contract. The success of one scheme had no bearing on the other. The two arose at different times from different circumstances and were not intertwined. See Unites States v. Macchia, 35 F.3d 662, 668 (2d Cir. 1994)("the dissimilarities of the two . . . schemes substantially outweigh any commonality").

3. To suggest otherwise, the government contends that the "fact Braskem made the Plant bribes necessarily had a direct impact on the success of the naphtha contract bribes, establishing a course of conduct that showed the bribe recipients that Braskem intended to fulfill its corrupt promises." G. Opp. 15. But that is a makeweight. Consider this hypothetical. In year 1, Company A agrees to buy a subsidiary (call it "X") of Company B, and, after protracted

negotiations, the deal is consummated.  Several years later, Company A agrees to buy a second subsidiary (call it "Y") of Company B, and negotiations proceed more smoothly because of the companies' prior dealings.  On these facts, would anyone conclude that in year 1, Company A agreed to buy X and Y from Company B?  Surely, the answer is "no," and just as surely there were two distinct agreements in this case.

        4.     In our opening brief, we used the <u>Korfant</u> factors to demonstrate that the two schemes here were separate conspiratorial agreements.  The government argues that "<u>Korfant</u> provides a framework for analyzing whether successive conspiracy prosecutions have improperly charged the same scheme in violation of double jeopardy," G. Opp. 12-13, and is inapposite to a duplicity claim.  We anticipated that argument and addressed it in our opening brief.  D. Mem. 7 n.9.  The point, however, is largely academic.  Under <u>Aracri</u>, a court must determine whether a conspiracy count alleges a single continuous criminal agreement or multiple ones.  The <u>Korfant</u> factors inevitably inform that determination, even if one eschews that name.  Relatedly, the government argues that "the <u>Korfant</u> analysis is generally conducted based on a full trial record, and not at the motion to dismiss stage." G. Opp. 13 n.6.  But <u>Korfant</u> itself, and several of its Second Circuit progeny, was an interlocutory appeal of a pre-trial ruling.  <u>See</u>, <u>e.g.</u>, <u>United States v. Gunn</u>, 366 F. App'x 215 (2d Cir. 2010); <u>United States v. Estrada</u>, 320 F.3d 173 (2d Cir. 2003); <u>Macchia</u>, 35 F.3d 662 (2d Cir. 1994).

*   *   *

        In sum, the government's contention that Mr. Grubisich agreed with others "to pay bribes to [Brazilian] officials, whenever necessary, to advance Braskem's economic interests," G. Opp. 11, is a contrivance designed to disguise the fact that the Polypropylene Plant Scheme is time barred.  This Court should see it for what it is, and dismiss Count One or, at a minimum, sever it into two and dismiss the Polypropylene Plant Scheme as untimely.

**COUNT TWO SHOULD BE DISMISSED BECAUSE MR. GRUBISICH WITHDREW FROM THE BOOKS AND RECORDS CONSPIRACY IN 2008 AS A MATTER OF LAW**

The government's argument that adjudication of the withdrawal defense is premature is premised on an incorrect legal standard and an insufficient factual proffer.

We recognize the significance of asking the Court to resolve our withdrawal claim on a motion to dismiss. But the allegations in this case are unique. Mr. Grubisich is charged with joining a books and record conspiracy spanning from January 2006 to April 2015, and it is undisputed that he had no ability to supervise Braskem's accounts and attest to their accuracy after June 2008, when he was removed as Braskem's CEO.[1] Although he subsequently served on Braskem's Board and worked for another Odebrecht company, the accuracy of Braskem's books was not within his purview.

In its response, the government writes that it has additional evidence, not yet proffered, that would contradict a withdrawal defense. G. Opp. 21 n.12. If so, the government should be encouraged to produce it. Hiding the ball advances no legitimate interest. The theory of Count Two -- that a CEO could leave that role in 2008 and still be part of a books and records conspiracy in 2015 -- is so breathtaking that the facts supporting it should be aired now and not concealed until trial.[2]

---

[1]  If the government is not relying on its submission of Mutual Legal Assistance Treaty ("MLAT") requests to toll the statute of limitations, then the operative date for limitation purposes is February 27, 2014, five years before the Indictment was returned. Even if the MLAT requests are properly considered (which we do not concede), the earliest operative date would be February 27, 2011. Thus, Mr. Grubisich's 2008 withdrawal renders Count Two untimely by any measure.

[2]  The government argues that because the money laundering conspiracy charged in Count Three promoted "substantive violations of the FCPA, not the conspiracies to violate the FCPA that were alleged in Counts One and Two," Count Three can survive even if Count One is impermissibly duplicitous and even if Mr. Grubisich withdrew from the Count Two conspiracy. G. Opp. 34 (emphasis in original). The government has yet to identify the specified unlawful

To bolster its argument, the government misinterprets the legal standard for withdrawal.  First, it claims that Mr. Grubisich's departure as CEO was not a "voluntary, affirmative act" because he was removed from the position.  G. Opp. 25.  But if the purpose of having a demanding withdrawal standard is "to make sure that a withdrawal did occur and is not simply being invented ex post," United States v. Greenfield, 44 F.3d 1141, 1150 (2d Cir. 1995), then being terminated is more convincing proof than walking away.  Second, the government argues that the Berger standard, which we cited in our opening brief -- departure "plus the absence of any subsequent activity in furtherance of the conspiracy" or the receipt of any benefit from it, 224 F.3d at 118 (2d Cir. 2000) -- applies only to "wholly criminal enterprises," of which Braskem is not one.  G. Opp. 25.  But that is also mistaken.  The Berger standard was first articulated in a legitimate enterprise case, United States v. Antar, 53 F.3d 568, 583 (3d Cir. 1995), and has been applied in this Circuit to both legitimate and illegitimate enterprise cases.  See, e.g., United States v. Hoskins, 73 F. Supp. 3d 154, 160 (D. Conn. 2014).  It is the test for all seasons.[3]

In sum, if ever a withdrawal claim can be resolved before trial, this one is it.

**COUNT THREE SHOULD BE DISMISSED ON SEVERAL GROUNDS**

Count Three, which alleges a conspiracy to violate 18 U.S.C. §1956(a)(2)(A), is defective for several reasons, none of which the government has adequately addressed.

---

activity that undergirds Count Three, and its relationship to Counts One and Two, which underscores the need for a bill of particulars.  See infra at 14.

[3]     The government cites to United States v. Leslie, 658 F.3d 140 (2d Cir. 2011), in which the defendant was found not to have withdrawn from an ATM fraud conspiracy despite his incarceration.  But for many criminals incarceration is just a "time out" and not an exit from activity.  Mr. Grubisich's departure from his position "disabled him from further participation [in a books and records conspiracy] and made that disability known to [his co-conspirators], [w]hich is enough."  United States v. Nerlinger, 862 F.2d 967, 974 (2d Cir. 1988).  Unlike a member of a criminal ring, he could not be expected to come back and resume his role.

A.      Mens Rea

Count Three should be dismissed because the Indictment fails to allege that Mr. Grubisich knew that funds were transferred to or from the United States.  As discussed in our opening brief, a knowledge requirement does not appear on the face of the statute, but is an implicit element, which is required to be alleged and proven.

1.      The government first argues that even if knowledge is an implicit element of the money laundering offense, it does not matter because the Indictment tracks the language of the statute.  G. Opp. 27-28.  But that argument ignores well-established law.  As the Supreme Court held almost 140 years ago, where an essential element of the crime is implicit in the statute, the indictment must allege that element; merely reciting the statutory language is not enough. United States v. Carll, 105 U.S. 611, 612 (1881)("it is not sufficient to set forth the offence in the words of the statute, unless those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished"); see also United States v. Foley, 73 F.3d 484, 488 (2d Cir. 1996)("[w]hen . . . one element of the offense is implicit in the statute, rather than explicit, and the indictment tracks the language of the statute and fails to allege the implicit element explicitly, the indictment fails to allege an offense"), partially overruled on other grounds by Salinas v. United States, 522 U.S. 52 (1997); 1 C. Wright & A. Miller, Fed. Practice and Procedure: Crim. §125 (4th ed. 2015)("[i]f the statute itself does not state an essential element of the offense or includes it only by implication, a pleading that merely repeats the statutory language will be insufficient -- the missing element must be directly alleged").

The Second Circuit's decision in United States v. Balde, 943 F.3d 73 (2d Cir. 2019), on which the government relies, did not disturb that settled rule.  As the government admits in a footnote, G. Opp. 28 n.15, Balde concerned a very different issue than that raised here, namely

whether "an indictment that expressly alleges a violation of a federal criminal statute, but omits a required element of that crime, deprives [a] district court of jurisdiction." Id. at 91.  The Second Circuit held that it did not.  Id. at 92.  But nothing in Balde suggests that an indictment that omits a required element can survive a motion to dismiss for failure to state an offense.  See id. at 89 ("there is a distinction between a lack of jurisdiction and a failure to state a claim").  Indeed, in Balde, the Court admonished the government to "take[] care to correctly state the [knowledge] requirement in future indictments." Id. at 91.[4]

        2.     That leaves the question whether knowledge that funds were transferred to or from the United States is an element of a §1956(a)(2)(A) crime.  The presumption of scienter supplies the answer to that question.  Simply put, courts generally interpret criminal statutes to require a mens rea as to every substantive element of the offense.  Torres v. Lynch, 136 S. Ct. 1619, 1630-31 (2016).  The presumption is strong:  a scienter requirement has been found "even where the statutory text is silent on the question" and "even where the most grammatical reading of the statute does not support one." Rehaif v. United States, 139 S. Ct. 2191, 2197 (2019).

        As we argued in our opening brief, the international transportation element in §1956(a)(2)(A) is substantive (as opposed to jurisdictional) because it "relate[s] to the 'harm or evil' the law seeks to prevent." Torres, 136 S. Ct. at 1624 (quoting Model Penal Code §1.13(10)).  Not surprisingly, the government disagrees.  In its view, the harm that the statute seeks to prevent is merely "promoting a specified unlawful activity," G. Opp. 30, and the connection to the United States (the "to or from" element) is jurisdictional.

---

[4]    The government's reliance on United States v. Bout, 731 F.3d 233 (2d Cir. 2013), is similarly misplaced.  In Bout, the Second Circuit held that an indictment that alleged a conspiracy to "kill" was sufficient to charge a conspiracy to commit murder. Id. at 240–41.  The Court said nothing about an indictment that fails entirely to allege an element of the offense.

The structure and history of the money laundering statute refutes that contention.[5]
The money laundering statute has three distinct subsections that criminalize promotional money
laundering.  The first proscribes conducting a financial transaction involving the proceeds of
specified unlawful activity "with the intent to promote the carrying on of [that] activity." 18 U.S.C.
§1956(a)(1)(A)(i).  The second applies to "sting" operations in which the defendant believes that
he is conducting a promotional transaction with criminal proceeds.  18 U.S.C. §1956(a)(3)(A).
The third, which is charged here -- the transfer of funds from a place in the United States to a place
outside the United States (or vice versa) with intent to promote the carrying on of specified
unlawful activity -- was clearly intended to address a different harm than the others.  If Congress
sought only to proscribe the promotion of specified unlawful activity, as the government contends,
it would have drafted a much different provision.

What then is the harm that §1956(a)(2)(A) is aimed at?  The legislative history
provides a convincing answer.  "Section 1956(a)(2) is designed to illegalize international money
laundering transactions."  S. Rep. No. 433, 99th Cong. 2d Sess. 11 (1986)(emphasis added).  Or
as one court has put it, the purpose of the statute was "to criminalize the use of United States
financial institutions as clearinghouses for criminal money laundering and conversion into United
States currency."  United States v. All Assets Held at Bank Julius Baer & Co., Ltd., 571 F. Supp.
2d 1, 12 (D.D.C. 2008); see also United States v. Piervinanzi, 23 F.3d 670, 679 (2d Cir.
1994)(holding that bank fraud and §1956(a)(2)(A) charges based on the same attempted
international wire transfers did not merge because the "transmission of . . . funds overseas" causes

---

[5]      The government urges the Court to restrict its analysis to the statutory language and
therefore not imply a knowledge element.  See G. Opp. 30.  But that proves too much.  Read
literally, §1956(a)(2) does not require a defendant to know that he is transporting funds.  A
knowledge requirement must be implied, and the only issue is its sweep.

a harm that is "analytically distinct" from bank fraud).  Plainly, one does not "use" a U.S. financial institution when the contact is accidental.

A comparison is instructive.  The Dyer Act, 18 U.S.C. §2311 et seq., makes it a crime to transport a stolen vehicle in interstate or foreign commerce.  The harm the law seeks to prevent is the theft of vehicles, and a vehicle's movement in interstate commerce is what confers jurisdiction.  That movement "ties the substantive offense to one of Congress' constitutional powers."  Torres, 136 S. Ct. at 1624.  Therefore, under settled law, one does not need to know that the vehicle crossed state lines to be guilty of the federal crime.  See Wapnick v. United States, 355 F.2d 136, 139 (2d Cir. 1966).  International money laundering is different.  The harm is the international transportation of money to promote unlawful activity.  That is what "ma[kes] the conduct dangerous or criminal."  United States v. Allen, 788 F.3d 61, 69 (2d Cir. 2015).  And that means that proof of knowledge -- not just of a transfer but of a transfer to or from the United States -- is required.[6]

3.      The government also argues that, even if we are correct on the law, the Indictment is still valid because it contains factual allegations sufficient to establish that Mr. Grubisich was aware the funds would be transported to or from the United States.  G. Opp. 31.  But that, too, is wrong.  The Indictment mentions only a handful of transfers that involved a U.S. account, and Mr. Grubisich is not alleged to have been involved in (or have knowledge of) any of them.  Indeed, he was removed as Braskem's CEO well before any of those transfers occurred.

---

[6]      Section 1956(a)(2)(A) forbids both the transfer of funds to or from the United States and "attempts" to do so.  One cannot attempt to transfer funds to or from the United States without knowing that a U.S. financial institution will be used.  Attempt requires intentional conduct.  See United States v. Anderson, 747 F.3d 51, 73 (2d Cir. 2014)("[t]o prove attempt, the government must establish beyond a reasonable doubt that the defendant (a) had the intent to commit the object crime and (b) engaged in conduct amounting to a substantial step towards its commission").

4.     We recognize that courts have routinely instructed juries without advising them that knowledge that the transfer will involve a U.S. bank is an element of the crime.  G. Opp. 30.  But what has been neither briefed nor argued is entitled to little weight.  <u>See</u> <u>United States v. L.A. Tucker Truck Lines, Inc.</u>, 344 U.S. 33, 37-38 (1952)(the implicit resolution by an earlier case of an issue that was not "raised in briefs or argument nor discussed in the opinion of the Court" is "not a binding precedent").[7]  As the Supreme Court has observed, a knowledge requirement is often "crucial [to] separating legal innocence from wrongful conduct," <u>United States v. X-Citement Video, Inc.</u>, 513 U.S. 64, 73 (1994), and an argument is not wrong merely because it is newly raised.  <u>See</u> <u>Henslee v. Union Planters Nat'l Bank & Tr. Co.</u>, 335 U.S. 595, 600 (1949)(Frankfurter, J., dissenting)("[w]isdom . . . ought not to [be] reject[ed] . . . merely because it comes late").

B.     <u>Extraterritoriality</u>

Count Three is also defective because it is impermissibly extraterritorial.  Our argument here is straightforward:  (1) for a non-U.S. citizen, like Mr. Grubisich, §1956(f) limits the extraterritorial scope of the monetary laundering statute to cases where "the conduct prohibited by [§1956]" "occurs in part in the United States"; (2) where, as here, "a statute provides for some extraterritorial application, the presumption against extraterritoriality operates to limit that provision to its terms," <u>Morrison v. Nat'l Australia Bank Ltd.</u>, 561 U.S. 247, 265 (2010); (3) "the conduct prohibited by [the statute]" in this case is a conspiratorial agreement in violation of §1956(h); and (4) a money laundering conspiracy is an inchoate crime that is complete at the time of the agreement without proof of an overt act, <u>Whitfield v. United States</u>, 543 U.S. 209, 214

---

[7]     In <u>United States v. Hoskins</u>, the issue was raised but not decided.  <u>See</u> Charge Conference Transcript, <u>United States v. Hoskins</u>, No. 12 Cr. 238 (JBA)(D. Conn. Nov. 2, 2019), ECF No. 600, at 73-75; <u>United States v. Hoskins</u>, 2020 WL 914302, at *11 (D. Conn. 2020).

(2005).  From those basic principles, it follows that, because the conspiratorial agreement alleged in Count Three was not formed, in whole or part, in the United States, it is outside the statute's extraterritorial scope.

We recognize that no court has endorsed our reading of §1956(f) and (h), but, to our knowledge no court has considered it.  The conclusion -- that there is no extraterritorial jurisdiction here -- follows inexorably from its premises and is faithful to <u>Morrison</u>'s teaching.  In response, the government argues that Count Three is not extraterritorial because the Indictment "clearly alleges that money was transferred to, from and/or through the United States in furtherance of the charged conspiracy."  G. Opp. 32.  But that framing only reinforces our point.  What matters is not the conduct that occurred "in furtherance of the charged conspiracy" but "the conduct prohibited by [the statute]," which is the conspiratorial agreement.  In the government's telling, any "conduct" undertaken in furtherance of a money laundering conspiracy, no matter how trivial, supports jurisdiction.  The government may prefer that broad reach, but it is not what Congress provided.

As the government sees it, it would be "absurd" to bar a foreign conspiracy charge when the agreement is subsequently carried out in this country.  <u>Id.</u> at 33.  But that concern has an obvious remedy:  a defendant can be charged with a substantive violation of the money laundering statute for conduct that takes place here.  Section 1956(f) poses no obstacle to such a charge.  The obstacle in this case, of course, is the statute of limitations.  Even on the government's view, Mr. Grubisich did not commit or aid and abet any substantive money laundering offense in the past decade, and so the government has resorted to a conspiracy charge for which extraterritorial jurisdiction is lacking.

C.      Due Process

        The extraterritoriality of Count Three raises another issue: due process.  Federal

criminal statutes cannot be applied to extraterritorial conduct unless there is "a sufficient nexus

between the defendant and the United States, so that such application would not be arbitrary or

fundamentally unfair."  United States v. Ramzi Yousef, 327 F.3d 56, 111 (2d Cir. 2003).  For a

sufficient nexus to exist, Mr. Grubisich must have "aim[ed] . . . to cause harm inside the United

States or to U.S. citizens or interests," United States v. Al Kassar, 660 F.3d 108, 118 (2d Cir.

2011), or at least known "that the charged conduct would have such an effect." United States v.

Jamal Yousef, 2010 WL 3377499, at *4 (S.D.N.Y. 2010).  Nothing in the Indictment suggests that

he had such an aim or knowledge in connection with Count Three.  Like the defendants in United

States v. Sidorenko, he "neither lived in, worked in, nor directed any of his alleged conduct at the

United States."  102 F. Supp. 3d 1124, 1333 (N.D. Cal. 2015).

        The government attempts to distinguish Sidorenko by noting that Mr. Grubisich

"worked for a U.S. publicly traded company, and that wires in furtherance of the money laundering

scheme were transferred to, from and/or through the United States."  G. Opp. 35.  The first point

is inconsequential.[8]  Mr. Grubisich is not challenging Counts One and Two -- the bribery and

books and records conspiracy charges -- on due process grounds; he is challenging the sufficiency

of the nexus between the money laundering conspiracy (Count Three) and the United States.[9]  As

---

[8]      It is also not factually right.  Braskem was not a "U.S. publicly traded company," at least
not in the sense that that phrase is usually understood.   Braskem was incorporated and
headquartered in Brazil.  Ind. ¶ 2.  Its American depositary shares traded in the United States, id.,
but its ordinary shares were listed in Brazil.

[9]      The due process analysis is undertaken on a count-by-count basis.  See, e.g., United States
v. Mostafa, 965 F. Supp. 2d 451, 458-60 (S.D.N.Y. 2013)(analyzing due process challenge to
multiple counts on a count-by-count basis).  The inquiry is whether due process permits application
of a particular statute, not whether the indictment as a whole contains a sufficient U.S. nexus.  See
Al Kassar, 660 F.3d at 118 ("[w]hen Congress so intends, we apply a statute extraterritorially as

Sidorenko demonstrates, it is not enough that Mr. Grubisich's employer had contacts with this country.  102 F. Supp. 3d at 1333.  The defendant himself must have aimed to do harm to U.S. interests or known that his conduct would have that effect.  The government's second point is no more persuasive.  The use of U.S. wires, of which Mr. Grubisich had no knowledge, cannot satisfy due process.  As we argued in our opening brief, a defendant cannot aim to cause harm in this country if he has no knowledge that funds will be transmitted to or from our institutions.  D. Mem. 24-25.

Furthermore, for a prosecution to comport with due process, a defendant must have "fair warning that [his] conduct exposed [him] to U.S. criminal prosecution."  Al Kassar, 660 F.3d at 119.  He cannot be held "criminally responsible for conduct which he could not reasonably understand to be proscribed."   Bouie v. City of Columbia, 378 U.S. 347, 351 (1964).   The government argues that Mr. Grubisich's alleged conduct was "self-evidently criminal" because it involved bribery and books and records violations.  See G. Opp. 36.  But that, again, conflates different counts.  The question is whether Mr. Grubisich had fair warning that promotional money laundering was unlawful, which he clearly did not.  Section 1956(a)(2)(A) has no analogue in Brazil or elsewhere outside the United States.  See D. Mem. at 25 & n.19.  Thus, Mr. Grubisich had no way of knowing that the transmission of lawfully obtained funds could expose him to a potential 20-year term.

---

long as doing so does not violate due process")(emphasis added); Ramzi Yousef, 327 F.3d at 111 ("in order to apply extraterritorially a federal criminal statute to a defendant consistently with due process, there must be a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair")(emphasis added).

## THE GOVERNMENT SHOULD BE COMPELLED TO PRODUCE A BILL OF PARTICULARS CLARIFYING THE INDICTMENT

The government responds to our request for particulars by trumpeting what it has produced -- "over 10 million documents along with detailed indices describing and cataloguing those documents," G. Opp. 38-39 -- and refusing to provide anything that we have requested in our motion.  As discussed below, the government has it wrong.

A.      Bribery Conspiracies

In our motion, we wrote that, to prepare a defense, Mr. Grubisich "must know if the government is accusing him of participating in any bribery schemes other than the Polypropylene Plant Scheme and the Naphtha Contract Scheme."  D. Mem. 26.  In its response, the government declines to provide an answer.  It calls those two schemes "examples of bribes in execution of the [overall] scheme," G. Opp. 42, thereby suggesting that it may offer proof of other "examples" at trial.  See also G. Opp. 38 (the Indictment "includ[es] examples of how the defendant furthered the schemes and conspiracies charged").  But if there are other examples, what are they? No competent defense counsel can defend this case if that question remains unanswered. Simply stated, the relief we seek here is that provided in United States v. Murgio, 209 F. Supp. 3d 698 (S.D.N.Y. 2016):  "If the government plans to introduce evidence of a bribe that is not already mentioned in the Indictment, then a bill of particulars as to such bribe(s) is appropriate to enable [the defendant] to prepare for trial and prevent surprise."  Id. at 723.[10]

None of the cases that the government cites supports its position.  For example, in United States v. Urso, 369 F. Supp. 2d 254, 272 (E.D.N.Y. 2005), the court denied a request for

---

[10]      The government seeks to distinguish Murgio, writing that here, "[u]nlike in Murgio, the defendant knows what conduct he is alleged to have participated in."  G. Opp. 43.  If that were so, we would not be seeking particulars.

the dates when each defendant joined the conspiracy and the "dates and locations of any meetings or conversations at which [the] Government will contend each defendant had joined [the] conspiracy."[11]   And in <u>United States v. Carroll</u>, 510 F.2d 507, 509 (2d Cir. 1975), the Second Circuit ruled that the government was not required to "disclose in a bill of particulars all the overt acts it will prove in establishing" that the defendants had conspired to rob a U.S. mail truck. Neither holding has pertinence here.  Mr. Grubisich does not seek more evidentiary detail or more overt acts as to the two schemes known to him.  He seeks to discover if there are schemes presently unknown to him that the government may attempt to establish at trial.[12]

In sum, it is a fundamental principle of criminal procedure that a bill of particulars is required "where the charges of the indictment . . . do not advise the defendant of the specific acts of which he is accused."  <u>United States v. Torres</u>, 901 F.2d 205, 234 (2d Cir. 1990).  That principle is flouted if other "examples" of bribe schemes that the government may seek to prove remain hidden until trial.

B.    <u>Transfers of Funds</u>

The government contends that our request for particulars about the money transfers alleged in the Indictment "require[s] [it] to catalogue . . . information and weave it into a narrative

---

[11]    Notably, in <u>Urso</u>, the court dismissed loansharking charges as to which the government did not disclose the identity of the alleged victims.  369 F. Supp. 2d at 267.  Just as a defendant in a loansharking case cannot prepare a defense without knowing whom he allegedly victimized, a defendant in a bribery case needs to know each alleged bribe.

[12]    The government devotes a page (G. Opp. 41) to an SEC case which holds that the identity of the foreign official involved in an FCPA scheme need not be pleaded in an FCPA civil complaint.  <u>See</u> <u>S.E.C. v. Straub</u>, 921 F. Supp. 2d 244, 265 (S.D.N.Y. 2013)("the statute contemplates situations in which the payor knows that a foreign official will ultimately receive a bribe but only the intermediary knows the foreign official's specific identity").  In <u>Straub</u>, however, the complaint informed the defendants that they had allegedly retained an intermediary to bribe Macedonian officials to prevent the issuance of a mobile telephone license.  <u>Id.</u> at 265-66.  Thus, the contours of the alleged scheme were known, even if the name of the bribe recipient was not.

of a fully integrated trial theory for the benefit of the defendant."  G. Opp. 44-45.  Hyperbole, however, is no substitute for particulars.  The indictment identifies 10 monetary transfers: Overt Acts ¶¶ 43(c), 43(e), 43(f), 43(g), 43(h), 43(i), 46(b), 46(d), 46(f), and 46(h).  Only four of the 10 -- Overt Acts ¶¶ 43(c), 43(f), 43(g), and 43(i) -- are said to relate to the Polypropylene Plant Scheme or the Naphtha Contract Scheme, and only four of the 10 -- Overt Acts ¶¶ 43(f), 43(g), 43(h), and 46(h) -- are said to involve a United States bank.  What about the others?  What bribery scheme, if any, do they relate to?[13]  Were any of them routed through a U.S. bank or were they entirely offshore transactions?

The government asserts that we should be able to suss out the answers to these questions from the material that has been provided.  G. Opp. 38, 43.  But it is well settled that the government does "not fulfill its obligations merely by providing mountains of documents to defense counsel who [are then] left unguided" to guess about conduct that is allegedly unlawful.  United States v. Bortnovksy, 820 F.2d 572, 575 (2d Cir. 1987).  Take just one example:  Overt Act ¶ 43(h) states that in April 2014, "members of the conspiracy caused $1,405,489.26 to be paid from a bank account in New York, New York, held by Braskem Incorporated to one of the Caixa 2 Entities."  What bribery scheme was that payment related to?  We are not seeking "a narrative of a fully integrated trial theory," but only a few words that will enable us to understand what Overt Act ¶ 43(h), and others like it, are about.

For these reasons and those in our opening brief, Mr. Grubisich's bill of particulars request should be granted.

---

[13]   The question can be put differently:  Count Three charges a conspiracy to "promote the carrying on of . . . specified unlawful activities, to wit: felony violations of the FPCA."  Ind. ¶ 48.  Are there violations other than the Polypropylene Plant Scheme and the Naphtha Contract Scheme that Count Three allegedly involves?

## **Conclusion**

For these reasons and those in our opening brief, the Indictment should be dismissed.

Dated:   August 5, 2020                          Respectfully submitted,
         New York, New York


                                                 By:    /s/ Edward Kim

                                                 KRIEGER KIM & LEWIN LLP
                                                 500 Fifth Avenue, 34th Floor
                                                 New York, New York 10110
                                                 Tel.: (212) 390-9550
                                                 Edward.Kim@KKLllp.com
                                                 Henry.Ross@KKLllp.com

                                                 BRACEWELL LLP
                                                 1251 Avenue of the Americas, 49th Floor
                                                 New York, New York 10020
                                                 Tel.: (212) 508-6100
                                                 Paul.Shechtman@Bracewell.com

                                                 *Attorneys for Jose Carlos Grubisich*