

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

AES:JN
F.#2019R00102

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

September 15, 2021

<u>By Hand and ECF</u>

The Honorable Raymond J. Dearie
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Jose Carlos Grubisich
               Criminal Docket No. 19-102 (RJD)

Dear Judge Dearie:

      The government respectfully submits this letter in advance of the sentencing scheduled for October 12, 2021, and in opposition to the defendant Jose Carlos Grubisich's sentencing memorandum requesting a sentence of time served (which is approximately four months). (<u>See</u> Defendant's Sentencing Memorandum ("Def. Mem.") at 2). For the reasons set forth below, the government recommends that the Court impose a sentence of 60 months' imprisonment.

      On April 15, 2021, the defendant pleaded guilty to (1) conspiracy to violate the anti-bribery provisions of the Foreign Corrupt Practices Act ("FCPA") and (2) conspiracy to violate the FCPA's books and records provisions and to fail to accurately certify financial reports as required under 18 U.S.C. § 1350. This guilty plea stems from a massive bribery and fraud scheme in which the defendant—a former Chief Executive Officer ("CEO") of Braskem, S.A. ("Braskem"), a multinational company listed on the New York Stock Exchange ("NYSE"), knowingly and willfully participated in a conspiracy to divert hundreds of millions of dollars from Braskem into a secret illegal slush fund and to pay bribes to government officials, political parties, and others in Brazil to obtain and retain business. Specifically, as the top executive at Braskem, the defendant agreed to create an off-the-books slush fund to divert funds from Braskem, to hide the existence of that slush fund through the use of offshore shell companies, to falsify Braskem's books and records in connection with payments into the slush fund, to pay bribes to Brazilian officials, and to provide false certifications to shareholders and regulators that concealed the bribery and fraud schemes. The defendant knew his conduct was illegal, but nevertheless chose to engage in that conduct over a course of many years.

In his sentencing memorandum, the defendant does not wrestle with the nature and seriousness of the crimes for which he is being sentenced and devotes barely two pages to discussing his criminal conduct. Instead, he appears to place the blame for the bribery and fraud schemes on his co-conspirators, characterizing himself as an "outsider" in a corrupt corporate culture and stating that "[h]is greatest regret is not walking away." (Def. Mem. at 24-25). The defendant submitted more than 100 letters heralding his ethical and moral standards and devotion to humanity, but failed to grapple with his ethical and moral failings with respect to the criminal conduct at issue in this case or the real-world impact of the bribery and fraud schemes in which he participated.

I.  Background

    A.  The Defendant's Tenure at Odebrecht and Braskem

Between 2002 and 2008, the defendant was the CEO of Braskem, a petrochemical company with headquarters in Brazil and operations throughout South America, Latin America, the United States and Europe, which was a subsidiary of Brazilian holding company Odebrecht S.A. ("Odebrecht"). (Presentence Report ("PSR") ¶¶ 7-8, 14). The defendant subsequently served on Braskem's Board of Directors from about 2010 to 2012. (Id. ¶ 14). From 2008 to 2012, the defendant was the CEO of ETH Bionergia S.A. ("ETH"), a subsidiary of Odebrecht in the ethanol business. (Id.).

During the relevant time period, American depositary shares of Braskem traded on the NYSE, and Braskem filed annual reports with the United States Securities and Exchange Commission ("SEC"). (PSR ¶ 7). As a result, Braskem was an "issuer" for purposes of the anti-bribery and accounting provisions of the FCPA. (Id.). The defendant held stock in both Braskem and Odebrecht. (See id. ¶ 18).

    B.  The Defendant's Role in a Conspiracy to Pay Bribes to Foreign Officials for the Benefit of Braskem

Starting in approximately 2002, when the defendant began his tenure as Braskem's CEO, the defendant was aware that Odebrecht was paying bribes to government officials on Braskem's behalf to further Braskem's economic interests. (PSR ¶ 15). In or about 2006, the defendant learned that Odebrecht would no longer pay bribes on Braskem's behalf unless Braskem contributed funds to make the payments. (Id.). As a result, the defendant agreed with senior executives at Braskem and Odebrecht to create an off-books illegal slush fund for Braskem, referred to internally as caixa dois ("Caixa 2"). (Id.).

Specifically, the defendant instructed Co-Conspirator 4,[1] a Braskem senior executive, to create a system for Braskem to generate funds for Caixa 2. (PSR ¶ 16). With the defendant's authorization, Co-Conspirator 4 hired Co-Conspirator 7, a consultant paid by Braskem, to establish three shell companies controlled by Braskem that were registered in the

---

[1] All anonymized individuals and entities referred to herein are the same as in the indictment.

2

United Kingdom (the "Caixa 2 Entities"). (Id.). The Caixa 2 Entities entered into fraudulent contracts with Braskem, and then Braskem and its subsidiaries made payments on those contracts from Braskem's bank accounts, including in Brazil, New York and Florida, to the Caixa 2 Entities' bank accounts. (Id.). Those fraudulent payments were subsequently transferred from the Caixa 2 Entities' bank accounts to bank accounts controlled by the Division of Structured Operations ("DSO"), a department within Odebrecht that was created and operated for the purpose of carrying out corrupt and other improper transactions in order to assist Odebrecht and Braskem in their efforts to obtain and retain business and economic benefits around the world. (Id.).

The defendant knew that the Caixa 2 Entities did not provide any legitimate services to Braskem and were created solely to generate funds that could be moved off of Braskem's books and funneled to Caixa 2. (PSR ¶ 16). He also knew that these funds were not recorded on Braskem's financial statements. (Id.). And the defendant agreed to have Odebrecht, through the DSO, make bribes and other illegal and corrupt payments to government officials in Brazil on Braskem's behalf. (Id.).

After the defendant stepped down as CEO of Braskem in 2008, his successors continued using the Caixa 2 system that the defendant helped create until approximately 2014. (PSR ¶ 17). The defendant was aware that Braskem and Odebrecht continued to use Caixa 2 during this period, and received emails from the DSO about Caixa 2's operations while he was CEO of ETH and as a member of Braskem's Board of Directors. (Id.). In total, between in or about 2006 and 2014, Braskem diverted approximately $250 million into the Caixa 2 Entities. (Id.).

In addition to agreeing to illegally divert Braskem funds into Caixa 2, the defendant also approved and agreed with others to make a specific bribe payment. (PSR ¶ 18). In or about 2006, Braskem sought to retain a contract with Petroleo Brasileiro S.A.— Petrobras ("Petrobras"), a Brazilian state-owned and controlled oil company (and thus a foreign government "instrumentality" as that term is used in the FCPA). (Id.). The contract in question was for the construction of a polypropylene (plastics) plant (the "Plant"), and the benefit to Braskem of retaining that contract was approximately $8.38 million. (Id.). The defendant agreed with Co-Conspirator 2, an executive at both Odebrecht and Braskem at various times, to pay a bribe to Foreign Official 1, who was then an executive and director of Petrobras (and thus a "foreign official" as that term is used in the FCPA), and others in exchange for Co-Conspirator 1's help in retaining the Petrobras contract for Braskem. (Id.). Specifically, the defendant approved a total of $4.3 million in bribe payments to Foreign Official 1; Foreign Official 2, a then-official in the legislative branch of the Brazilian government (also a "foreign official" as that term is used in the FCPA); and their affiliated political party. (Id.). As a result of those bribe payments, the majority of which were made while Grubisich was still CEO, Braskem retained the Petrobras contract. (Id.).

      C.    <u>The Defendant's Role in a Conspiracy to Falsify and to Falsely Certify the Accuracy of Braskem's Books and Records</u>

While the defendant was CEO of Braskem, he agreed with others to falsely record payments diverted to the Caixa 2 Entities as "commissions" payments in Braskem's financial

3

records. (PSR ¶ 19). The defendant knew that the contracts authorizing these payments were false, that the companies did not provide any legitimate services and that the payments themselves were sent to the DSO and ultimately used, in part, to pay bribes. (Id.). In his role as CEO, the defendant signed, and agreed that he and others would sign, written certifications to Braskem's Annual Report for fiscal years 2006 and 2007 that were filed with the SEC. (Id.). These certifications attested that the Annual Reports were accurate and that the defendant had disclosed any fraud, whether material or not, that involved management and/or other employees at Braskem. (Id.). The defendant signed these certifications even though he knew that (i) Braskem's books and records contained false information about the diversion of company funds to the Caixa 2 Entities, and (ii) Braskem paid bribes to Brazilian officials to obtain and retain business. (Id.).

After the defendant stepped down as Braskem's CEO, his co-conspirators continued to make false written certifications to the SEC through fiscal year 2014, which included the period when the defendant was on Braskem's Board of Directors. (PSR ¶ 19). These false written certifications submitted to the SEC by the defendant and his co-conspirators concealed the existence of Caixa 2, the falsification of Braskem's books and records in connection with Caixa 2, and the bribery scheme from Braskem's investors, the investing public, and the SEC. (Id.).

D. Guilty Pleas of the Defendant, Odebrecht, and Braskem

On December 21, 2016, Braskem and Odebrecht pled guilty before the Court to separate criminal informations charging each with conspiracy to violate the anti-bribery provisions of the FCPA for their involvement in the above-described bribery and money laundering scheme. See United States v. Odebrecht, 16-CR-643; United States v. Braskem, 16-CR-643.

In February 2019, a grand jury in the Eastern District of New York returned a three-count indictment against the defendant, charging him with conspiracy to violate the FCPA's anti-bribery provisions (Count One), conspiracy to violate the FCPA's books and records provisions and to fail to accurately certify financial reports (Count Two), and conspiracy to commit money laundering (Count Three). The defendant was arrested on November 20, 2019 and released on bond on March 25, 2020. (PSR page 1). On April 15, 2021, Grubisich pled guilty to Counts One and Two of the indictment.

II. Sentencing Guidelines

The government recommends that the Court adopt the below United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") calculation:

<u>Conspiracy to Violate the FCPA's Anti-Bribery Provisions</u> (Count One)

| | |
|---|---:|
| Base Offense Level (§ 2C1.1(a)(2)) | 12 |
| Plus: Value of Benefit (> $3.5 million) (§ 2B1.1(b)(1)(J)) | +18 |
| Plus: High Level Official (§ 2C1.1(b)(3)) | <u>+ 4</u> |
| Adjusted Offense Level | 34 |

<u>Conspiracy to Violate the FPCA's Books and Records Provisions &
To File False Financial Reports</u> (Count Two)

| | |
|---|---:|
| Base Offense Level (§ 2B1.1(a)(2)) | 6 |
| Plus: Loss Amount (> $250 million) (§ 2B1.1(b)(1)(O)) | +28 |
| Plus: Conduct Outside U.S./Sophisticated Means (§ 2B1.1(b)(10)) | + 2 |
| Plus: Officer or Director of Public Company (§ 2B1.1(b)(20)(A)) | <u>+ 4</u> |
| Adjusted Offense Level | 40 |

Multiple Count Analysis (§§ 3D1.1, 3D1.2, 3D1.3, 3D1.4)

| | | | <u>Level</u> | <u>Units</u> |
|---|---|---|---:|---:|
| Highest Adjusted Offense Level: | | | 40 | |
| <u>Group 1</u>: | Bribery | | 34 | 0.5 |
| <u>Group 2</u>: | Books and Records Violations/ False Certifications | | 40 | 1 |
| Plus: | 1.5 Units (§ 3D1.4) | | | <u>+ 1</u> |
| Total: | | | | 41 |
| Acceptance of Responsibility (§§ 3E1.1(a), 3E1.1(b)): | | | | <u>- 3</u> |
| Final Adjusted Offense Level: | | | | 38 |

As the defendant has no criminal history, he falls within Criminal History Category I (PSR ¶ 43) with an applicable range of imprisonment of 235 to 293 months. However, because the statutory maximum for each of the two counts of conviction is 60 months, the effective Guidelines range of imprisonment is 120 months. In addition, pursuant to Federal Rule of Criminal Procedure

5

11(c)(1)(B), the government recommends that the sentence imposed on each count run concurrently.

As detailed in the government's letter to Probation, dated July 14, 2021, setting forth its objections to the PSR, the above-described Guidelines calculation – which was set forth in the defendant's plea agreement and stipulated to by the defendant, who joined in the government's objections – differs from the Guidelines calculation in the PSR and addendum to the PSR, dated August 24, 2021 ("PSR Addendum"), in three respects: (1) the grouping analysis, (2) the loss amount for Count Two, and (3) the number of bribes.[2] (See Exhibit 1 (Govt. Objections to PSR)). The government maintains that its Guidelines calculation is accurate. However, the government also notes that regardless of whether the Court agrees with the government or Probation as to these disputed points, the effective Guidelines range for the defendant remains at 120 months.

III.     Applicable Law

A "district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." Id. at 50 (citation and footnote omitted).

Title 18, United States Code, Section 3553(a) provides that, in imposing sentence, the Court shall consider:

(1)     the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)     the need for the sentence imposed—

    (A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)     to afford adequate deterrence to criminal conduct; [and]

    (C)     to protect the public from further crimes of the defendant.

---

[2] As initially drafted, the Guidelines calculation in the PSR included a three-level reduction pursuant to U.S.S.G. § 2X1.1(b)(2), to which the government also objected; in the PSR Addendum, Probation agreed that this reduction was not applicable and struck it from the PSR's Guidelines calculation. (See PSR Addendum at 2).

Section 3553 also addresses the need for the sentence imposed "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). "[I]n determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, [the Court] shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a).

At sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. Thus, the Court should first calculate the applicable Guidelines range, and then apply the Section 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

IV. The Appropriate Sentence

Contrary to the defendant's assertions, given the seriousness and scope of the criminal conduct and the defendant's position as the top executive of a publicly-traded company when he participated in the offenses, a substantial sentence is warranted to provide just punishment, to promote respect for the law, and to effect adequate deterrence. Indeed, for the reasons set forth below, the government respectfully recommends a sentence of 60 months.

    A. The Recommended Sentence is Appropriate to Promote Respect for the Law

The corrosive effects of corruption of government officials can hardly be debated: among other harms, bribery schemes undercut fair business practices, undermine the rule of law, destabilize countries and even entire regions, and facilitate human rights abuses. Only the corrupt prosper; societies, governments, and legitimate businesses lose. The United States has long recognized the harmful effects caused by bribery of foreign officials and sought to combat them. The defendant's direct involvement in bribing Brazilian government officials is at the heart of what Congress sought to eradicate with the FCPA.

The FCPA was enacted by Congress in 1977 to combat corruption harmful to foreign economies and governments, to enhance the United States' public image worldwide, to level the playing field between corrupt businesses and those who refused to pay bribes, and to ensure stability in the U.S. economy by requiring companies to give potential investors an accurate picture of their finances. See United States v. Kay, 359 F.3d 738, 746 (5th Cir. 2004) (noting that, in passing the FCPA "Congress resolved to interdict such bribery, not just because it is morally and economically suspect, but also because it was causing foreign policy problems for the United States"). As the House Report accompanying the bill stated: "The payment of bribes to influence the acts or decisions of foreign officials, foreign political parties or candidates for foreign political office is unethical. It is counter to the moral expectations and values of the American public. But not only is it unethical, it is bad business as well. It erodes public confidence in the integrity of the free market system." H.R. Rep. No. 95-640 (1977) at 4.

Indeed, the effects of Operation Car Wash or "Lava Jato," a years-long investigation that rooted out bribes made by Odebrecht and its related entities, such as Braskem, to government officials at the highest levels in the Brazilian government, including the Brazilian Executive Branch, Congress, political parties, its state-owned and controlled oil giant Petrobras, and other Brazilian government officials, has been profound for Brazil and its citizens. As described in more detail below, the defendant and his co-conspirators had a direct role in causing the corruption at the heart of the investigation in Brazil.

The involvement of Petrobras and Odebrecht—two of the largest companies in Brazil—in this corruption scheme, had a severe impact on the Brazilian economy and resulted in lost jobs for Brazil's lower and middle class, and for investors worldwide.[3] The rampant corruption in the oil sector has also hurt the rule of law in Brazil, and caused a loss of faith in the Brazilian democracy, national pride and national identity.[4] Lava Jato "provoked something that transcends outrage. Brazilians are in the midst of an identity crisis. Much of Brazil's recently acquired cachet looks as if it was the product of fraud, and for an added touch of humiliation, a fraud cooked up at a company [Petrobras] long regarded as an emblem of Brazil's success and aspirations." See id.

The bribery scheme also had an impact on the shareholders of Braskem and the integrity of the U.S. financial system. American depository shares of Braskem traded on the NYSE and Braskem was required to file annual reports with the SEC attesting to the accuracy of Braskem's Annual Reports. The defendant himself certified that Braskem fully complied with the law and that the information contained in Braskem's annual reports fairly represented the financial condition and results of operations and cash flows of Braskem. The defendant knew that this was not the case and knowingly and willfully concealed the bribery and fraud scheme at Braskem.

---

[3] See Paulo Sotero, Brazilians Rise Against Corruption, Wilson Center, May 10, 2016, available at https://www.wilsoncenter.org/article/brazilians-rise-against-corruption (last accessed September 9, 2021); Kenneth Rapoza, How much of Brazil's Economy Got Lost in Petrobras Scandal?, April 4, 2015, Forbes, available at https://www.forbes.com/sites/kenrapoza/2015/04/04/how-much-of-brazils-economy-got-lost-in-petrobras-scandal/?sh=692055dc228a (last accessed September 12, 2021).

[4] David Segal, Petrobras Oil Scandal Leaves Brazilians Lamenting a Lost Dream, New York Times, August 7, 2015, available at https://www.nytimes.com/2015/08/09/business/international/effects-of-petrobras-scandal-leave-brazilians-lamenting-a-lost-dream.html (last accessed September 9, 2021); Samuel Pinheiro Guimarães, Operation Lava Jato and the Destruction of the Rule of Law, April 16, 2018, Open Democracy, available at https://www.opendemocracy.net/en/democraciaabierta/operation-lava-jato-and-destruction-of-rule-of-law/ (last accessed September 9, 2021).

B.  The Recommended Sentence is Appropriate Given the Nature and Circumstances of the Offense and the Need for Just Punishment

The nature and seriousness of the defendant's offense counsels for a significant incarceratory sentence in this case. The defendant spends about two pages out of his twenty-nine-page sentencing memorandum addressing his criminal conduct. In those two pages, he gives no recognition to the serious consequences of his criminal conduct beyond the impact on himself and his family. Instead, he quotes his allocution from the plea hearing and attempts to pass the blame for his criminal conduct onto his co-conspirators by stating that he "agreed to honor a commitment made by others to pay a bribe to a Brazilian official and to the creation of an off-the-books slush fund." (Def. Mem. at 24). He accepts that he "signed certifications to the SEC that hid the existence of th[e slush] fund" but then argues that he "did not initiate those crimes and did not profit directly from them." (See id. at 24-25). These statements fail to grasp the seriousness of the offense and attempt to minimize the defendant's role in the wrongdoing.

The defendant was not a low-level employee who was forced to go along with corrupt conduct initiated by others. He served as CEO, the highest-level executive at Braskem. It is clear that the defendant understood the discretion and power he had to shape Braskem's conduct, as he touts how he "grew Braskem into the largest petrochemical company in Latin America" in his six years at the helm of that company. (Def. Mem. 7). In his role as CEO, the defendant also had the ability and responsibility to set the tone at the top. He was responsible for acting in the best interests of shareholders who had entrusted him and the company with their investment. Instead of ensuring that the company employed ethical business practices, he voluntarily participated in a scheme to divert millions of dollars from the company and to pay bribes to Brazilian government officials. And after that, he falsely certified SEC filings and lied to Braskem's shareholders around the world.

Not only does the defendant fail to grapple with his participation in serious criminal conduct, he suggests that in trying to achieve the altruistic goal "to return to Brazil to contribute to his country by building a competitive international firm" (Def. Mem. at 6), he was sucked into corrupt conduct perpetrated by others and that "[h]is greatest regret is not walking away" (id. at 25). The defendant's crime is not that he simply failed to walk away from criminal conduct perpetrated by others. He is not before the Court because he is guilty by association. As the defendant admitted in his allocution, he participated in a scheme to pay bribes to Brazilian government officials, to create an illegal off-the-books slush fund, to divert Braskem funds into that illegal slush fund to be used for improper and illegal purposes, to falsify Braskem's books and records to conceal the diversion into the slush fund, and to lie to regulators and shareholders about the illegal diversion and the bribery.

The defendant is correct that "corrupt practices were deeply entrenched [at the Odebrecht group of companies] well before his arrival." (Def. Mem. at 24). But as he himself admits, he was an "outsider" who did not grow up within the Odebrecht group of companies. He spent twenty-five years at a multinational company where, according to one of the letters he submitted, "his ethical conduct was always evident." (Id. at 4-5). This track record demonstrates that he knew how to grow a company in an ethical and legal manner, but intentionally chose not to do so at Braskem; instead, he chose to gain business through

9

corruption. Moreover, although the defendant suggests that he was removed from his role as CEO of Braskem because "he was not 'political enough' for the job" (id. at 7), he has never argued, nor could he, that he ever objected to paying bribes during his tenure at Braskem. Nor did he ever object to paying bribes during his additional four years working for Odebrecht and serving on Braskem's Board of Directors, at which time he received emails demonstrating that Braskem was still maintaining and using a slush fund for illicit purposes.

In short, the defendant was well aware of his ethical and legal obligations, and his responsibility to impart those obligations on those that reported to him. Instead, the defendant opted to engage in corrupt and fraudulent conduct and ratify the illicit behavior of his co-conspirators. The defendant's invocation of Odebrecht's "culture" is problematic because this culture reflected the willingness of its management, including the defendant, to look past the applicable laws and ethics for the benefit of the company and ultimately their own jobs and wallets. The defendant and his co-conspirators helped deprive the citizens of Brazil of the honest services of their public officials; they encouraged a system that made it impossible for honest and ethical businesses to compete for work; they undermined confidence in public institutions in Brazil; and they lied to U.S. shareholders and regulators.

In an attempt to justify his request for time served, the defendant states that "[m]any of the 'Operation Carwash' defendants sentenced in Brazil for their roles in the bribery crimes received home confinement sentences." (Def. Mem. at 25 n. 6). But the defendant fails to mention that all of these individuals cooperated with the Brazilian investigation.[5] The defendant also had the ability to accept responsibility for his role in the bribery and fraud scheme and to cooperate with the Brazilian investigation in exchange for leniency, but chose not to do so.[6] As a result, the Court should not give him the same leniency that the cooperators in Brazil received.

The defendant also mentions that this is "the unusual case in which the Court is called upon to sentence a defendant in 2021 for conduct that occurred years before." (Def. Mem. at 24; see also id. at 25 (stating that his conduct is 15 years old)). First, the defendant's criminal conduct is not as old as he suggests because he never withdrew from the conspiracy. Although the defendant was removed as Braskem's CEO in 2008, he continued to work for Odebrecht and served on Braskem's Board of Directors until about 2012.[7] (PSR ¶ 14). During this period, he was aware that Braskem and Odebrecht continued to use Caixa 2 and received emails from the DSO about Caixa 2's operations. (Id. at ¶ 14). Second, as this case demonstrates, individuals who perpetrate sophisticated, complex foreign bribery schemes purposefully make it difficult for authorities to uncover, investigate, and prosecute their criminal conduct. Here, the defendant and

---

[5] See https://www.jornaldocomercio.com/_conteudo/2017/02/politica/547574-mpf-firma-acordo-com-10-paises-para-investigar-odebrecht.html.

[6] See https://veja.abril.com.br/blog/radar-economico/grubisich-se-recusou-a-fazer-parte-da-lista-de-delatores-da-odebrecht/.

[7] Under a contractual agreement, between 2012 through 2013, after his employment at Odebrecht ended, Odebrecht also paid the defendant $2.19 million each year.

his co-conspirators diverted Braskem funds to several offshore shell companies based in the United Kingdom. (Id. at ¶ 16). Those funds were then funneled to other shell companies controlled by the DSO and then the DSO provided the money to government officials and others as bribes or other improper payments. (Id.). The scheme lasted almost a decade, and as soon as the government learned of the scheme, it moved quickly to gather documentary and testimonial evidence from multiple countries in order to charge this case. Thus, it is not unusual for defendants in foreign bribery cases to be prosecuted and sentenced years after their participation in the crimes, and, as a result, the defendant should not get any benefit for the delay in his prosecution and sentencing.

> C. The Defendant's Personal History and Characteristics Do Not Outweigh the Serious Nature of His Crime

A significant portion of the defendant's sentencing memorandum concerns his personal history, including his hard work in life, professional success, acts of kindness and charitable contributions to others, and personal and family circumstances, which include his own health problems. (See, e.g., Def. Mem. at 1-4, 13-16, 27-28). The government agrees that these factors should be considered by the Court in arriving at a sentence under 18 U.S.C. § 3553(a), and the government's proposed sentence accounts for the defendant's circumstances. But while the defendant has had significant opportunities to help others, his actions in this regard do not set him apart from similarly situated defendants who have had the opportunity to engage in good deeds and charitable acts, face the same or similar challenges as a result of incarceration, and whose families often suffer disproportionately despite having no role in the criminal conduct.

Indeed, "[c]ivic, charitable or public service; employment-related contributions; and similar prior good works are not ordinarily relevant in determining whether a departure is warranted." U.S.S.G. § 5H1.11. Instead, charitable work warrants a downward departure only where it is "present to an exceptional degree or in some other way makes the case different from the ordinary case where [charitable work] is present." United States v. Canova, 412 F.3d 331, 358 (2d Cir. 2005). Moreover, "more is expected" of those defendants "who enjoy sufficient income and community status so that they have the opportunities to engage in charitable and benevolent activities." United States v. Cooper, 394 F.3d 172 (3d Cir. 2005) (internal quotation marks omitted). Cf., e.g., United States v. Crouse, 145 F.3d 786, 792 (6th Cir. 1998) (no downward departure warranted where a defendant's "community works," while "significant," are "not unusual for a prominent businessman"). These principles should similarly guide an analysis under Section 3553(a). And here, while the defendant may have led an otherwise law-abiding life and engaged in charitable work, his personal and family characteristics do not absolve him of responsibility for his serious and long-lasting criminal conduct, and are not so extraordinary or exceptional as to warrant the leniency he seeks, that is, time served.

Moreover, while the government does not minimize the defendant's health problems, many defendants incarcerated in this district (and others) face ailments as severe and more severe than that suffered by the defendant. As the defendant's sentencing memorandum acknowledges, he was already incarcerated for a four-month period before presenting a significant bail package and being released. (Def. Mem. at 2). During that time his health condition was properly cared for by the Bureau of Prisons ("BOP"). Moreover, a prison

11

sentence, would be no more "hard time" for the defendant given restrictions in federal facilities than it would be for any other inmate. (Id. at 27). The defendant should not be treated differently merely because his financial situation afforded him the ability to present a significant bail package and obtain his liberty while pending resolution of his case.

> D. The Recommended Sentence is Appropriate to Afford Adequate Deterrence to Similar Criminal Conduct

Finally, the government asks this Court to consider the need for deterrence of those who would consider engaging in similar conduct under similar scenarios. Given the strong economic incentives in taking advantage of countries with public officials willing to trade contracts for kickbacks, it is critical that there be equally strong counterincentives. See United States v. Blech, 550 F. App'x 70, 71 (2d Cir. 2014) (summary order) ("Blech was sentenced based on the 18 U.S.C. § 3553(a) factors, including the need for specific deterrence for a recidivist, and the need for general deterrence for those who might otherwise feel that some white-collar crimes are 'game[s] worth playing.'") (quoting United States v. Goffer, 721 F.3d 113, 132 (2d Cir. 2013)); S. Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259 ("The second purpose of sentencing is to deter others from committing the offense. This is particularly important in the area of white collar crime. Major white collar criminals often are sentenced to small fines and little or no imprisonment. Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business.")). The government's recommended sentence will send a strong deterrent message to those who share the defendant's senior role in companies that engage in bribery and related conduct.

Furthermore, given that sophisticated fraud schemes, like the instant scheme with multiple international actors, are difficult to detect and prosecute, there is greater need for general deterrence. See, e.g., Harmelin v. Michigan, 501 U.S. 957, 988 (1991) (noting that "since deterrent effect depends not only upon the amount of the penalty but upon its certainty, crimes that are less grave but significantly more difficult to detect may warrant substantially higher penalties"). Because "economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." See, e.g., United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (quoting Stephanos Bibas, White–Collar Plea Bargaining and Sentencing After Booker, 47 Wm. & Mary L. Rev. 721, 724 (2005)) (internal quotation marks omitted)); United States v. Heffernan, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); Drago Francesco, Roberto Galbiati & Pietro Vertova, The Deterrent Effects of Prison: Evidence From a Natural Experiment, 117 J. of Political Econ. 257, 278 (2009) ("Our findings provide credible evidence that a one-month increase in expected punishment lowers the probability of committing a crime. This corroborates the theory of general deterrence.").

      E.      The Defendant's BOP Classification and Potential ICE Detention Are Not <u>Appropriate Sentencing Factors</u>

The defendant urges the Court to depart downward based on his assertion that he would not be eligible to be designated to a "camp" due to his status as a non-citizen, and that he would potentially face additional detention in an immigration facility while awaiting deportation to Brazil after completing his sentence. (Def. Mem. at 26). As an initial matter, many foreign national non-resident defendants are subject to the exact same post-sentencing conditions.

Moreover, the Second Circuit has repeatedly rejected the same argument in the context of a downward departure for reasons that apply with equal force to the defendant's request for a variance. In <u>United States v. Restrepo</u>, 999 F.2d 640, 641 (2d Cir. 1993), the Second Circuit held that, although there may be rare circumstances when alienage can be considered in sentencing a defendant, a district court may *not* consider "(1) the unavailability of preferred conditions of confinement, (2) the possibility of an additional period of detention pending deportation following the completion of sentence, and (3) the effect of deportation as banishment from the United States and separation from family, justified the departure." <u>Id.</u> at 644.

With respect to the issue of whether the defendant could be designated to a camp, the Second Circuit stated that BOP did not have a steadfast policy against doing so, but noted:

> Even if it were a steadfast policy of the Bureau to deny reassignment to relaxed-security facilities to alien prisoners who must be deported on account of their convictions, we would consider that policy an inappropriate basis for departure from the imprisonment range prescribed by the Guidelines. Assuming that § 3624(c) was intended to apply to deportable aliens, the statute does not on its face require the Bureau to ensure that all prisoners participate in such a program, but only to do so if practicable. For example, the Bureau need not reassign the prisoner to a halfway house if there is no such unit in his home state, and the absence of such a facility has been held to be an impermissible ground for departure from the Guidelines.

<u>Id.</u> at 645 (citation omitted). The Second Circuit concluded that, "if there is a defect in the Bureau's policy toward reassignment of deportable aliens, the appropriate way to remedy that defect would be pursuit of an action that challenges such a policy head-on, not the ad hoc granting of departures that have the effect of creating the very type of disparity in sentencing that the adoption of the Guidelines was intended to eliminate." <u>Id.</u> at 646.

With respect to detention while awaiting deportation, the Second Circuit held that such detention, which averages approximately two months, is likewise not a sufficient basis for a downward departure. "Since a deportable alien may be detained though he has not been convicted of a crime, a detention that occurs pending deportation following a convicted alien's completion of his term of imprisonment should not be viewed as a detention resulting solely from his conviction. Nor should it be viewed as part and parcel of the punishment for his

13

criminal offense. Rather, it is part of a penalty that has traditionally been termed civil rather than punitive. Hence, in comparing the punishments meted out to an alien and to a citizen, respectively, it is inapt to measure the latter's sentence against the former's sentence plus deportation-related detention." Id. at 646 (internal cites omitted).

Even courts—principally in other circuits—who have permitted departures based on alienage have done so "where the conditions in question are 'substantially more onerous than the framers of the guidelines contemplated in fixing the punishment range for the defendant's offense [ . . .,] and the differences in the conditions of confinement or other incidents of punishment between deportable aliens and other citizen (or nondeportable alien) defendants . . . are not great.'" United States v. Mohammed, 315 F. Supp. 2d 354, 367 (S.D.N.Y. 2003) (quoting United States v. Guzman, 236 F.3d 830, 834 (7th Cir. 2001)) (alterations in original). The court in Mohammed, in rejecting a departure, found that "[i]neligibility for half-way houses or minimum security institutions, the only consequences Mohammed relies upon, are not such extraordinary deprivations as to warrant a finding that the Commission did not take into account the chance that someone in this sentencing range would be subjected to them." Id.

The Second Circuit has reaffirmed its holding in Restrepo in the post-Booker advisory Sentencing Guidelines regime. See United States v. Duque, 256 F. App'x 436, 437-38 (2d Cir. 2007) (citing Restrepo for the proposition that "'(1) the unavailability of preferred conditions of confinement, [and] (2) the possibility of an additional period of detention pending deportation following the completion of sentence,' generally do not justify a departure from the Sentencing Guidelines range"); see also United States v. Wills, 476 F.3d 103, 107 (2d Cir. 2007) ("Now, after Booker, we reaffirm the reasoning of Restrepo and apply it to Wills's non-Guidelines sentence, which was partly based on the purported 'additional punishment' of deportation."); Rosario v. United States, 625 F. Supp. 2d 123, 130 (S.D.N.Y. 2008) (declining to exercise discretion afforded by Kimbrough v. United States, 552 U.S. 85 (2007), and holding "[i]n light of the legal authority in this Circuit, therefore, Petitioner's ineligibility for certain correctional programs due to his alien status, while unfortunate, is not an adequate basis for a downward departure of his sentence").

Indeed, the defendant's alienage may end up affording him less time in prison than that imposed by the Court. The defendant, as a Brazilian citizen, has the ability to seek a prisoner transfer to Brazil to complete his sentence, at which point it would be up to Brazil to determine how much of his prison sentence he should serve. As the defendant notes, the government has agreed to not oppose his application to transfer any incarcerative sentence to Brazil, and if his request is successful, his sentence may be reduced.[8]

---

[8] The defendant also suggests that in fashioning a sentence, the Court should consider his 17 months of home confinement during a pandemic that prevented his family from traveling from Brazil to visit him. (Def. Mem. at 25). The government does not doubt the difficulty of this separation for the defendant and his family, but that is a burden that is no greater than—and in many cases much less than—other burdens that American and Brazilian citizens have had to bear during these trying times.

V.  Conclusion

For the foregoing reasons, the government respectfully requests that the Court impose a sentence of 60 months' imprisonment. This sentence is sufficient, but not greater than necessary, to achieve the goals of sentencing. See U.S.S.G. § 3553(a)(2).

Respectfully Submitted,

JACQUELYN M. KASULIS
Acting United States Attorney

By:     /s/
Alixandra Smith
Julia Nestor
Assistant U.S. Attorneys
(718) 254-6370/6297

JOSEPH S. BEEMSTERBOER
Acting Chief, Fraud Section
Criminal Division
Department of Justice

By:     /s/
Lorinda Laryea
Leila Babaeva
Trial Attorneys
(202) 549-5731/(202) 353-3439

cc:     Clerk of Court (RJD) (by ECF)
        Defense counsel (by ECF)